[Nos. 37641, 37642. En Banc. January 12, 1967.]

PUGET SOUND ALUMNI OF KAPPA SIGMA, INC., *et al., Respondents and Cross-appellants,* v. THE CITY OF SEATTLE, *Appellant and Respondent.*

NORTHWEST STEEL ROLLING MILLS, INC., *Respondent,* v. THE CITY OF SEATTLE, *Appellant.*\*

\*Reported in 422 P.2d 799.

*A. L. Newbould* and *John P. Harris*, for appellant.

*John P. Cogan*, for respondents and cross-appellants.

HUNTER, J.—In these consolidated actions, 12 plaintiffs (respondents-cross-appellants), claiming the right to represent a total of 92 persons in a class action, sought recovery from the defendant (appellant), city of Seattle, of sums paid to the defendant in connection with street vacations sought and obtained by such 92 persons. The plaintiffs also sought a permanent injunction enjoining the city from collecting such charges in the future.

The trial court (1) granted 10 of the 12 plaintiffs summary judgment against the city of Seattle, allowing them recovery of the sums which they had paid to the city, less $100 paid by each as a filing fee upon their respective petitions for street vacations; (2) allowed interest upon the amounts recovered from the date such sums were paid to the city; (3) dismissed claims of plaintiffs Topp and West Seattle Congregational Church with prejudice as barred by the statute of limitations; (4) denied with prejudice the claim that a class action could be maintained in behalf of all 92 persons alleged to be similarly situated; and (5) permanently enjoined the city from making any street vacation charges in the future, other than the $100 filing fee upon each petition to vacate thereafter filed.

The city of Seattle appeals from the judgment in its entirety except as to the court's dismissal of two of the plaintiffs and the denial of plaintiffs' claim of a class action.

The plaintiffs in King County Cause No. 599874 cross-appeal from the judgment dismissing the claims of plaintiffs Topp and the West Seattle Congregational Church and from the dismissal of the plaintiffs' claim for a class action

in behalf of the unnamed persons who had paid like charges to the city.

The record discloses that since 1937 the city of Seattle has required all petitioners for street vacation to pay an initial fee of $100. The city then processes the petition through the city council's streets and sewers committee. This includes consideration of the petition by 17 departments or subdivisions of city departments, all of which then make recommendations to the Board of Public Works as to whether the petition should be granted. On public notice, a hearing is then held before the streets and sewers committee as provided by RCW 35.79.030, and, if the committee recommends granting the petition to vacate, the petitioner is informed that it is the city council's policy to charge the petitioner one-half of the appraised value of the area sought to be vacated, less the $100 paid. The city engineer procures such appraisal and notifies the petitioner that the vacation ordinance will not be introduced until such sum is paid. On receipt of such portion of the appraised value, the vacation ordinance is then introduced and considered. If the ordinance fails of passage, the sum paid by petitioners, less the $100 initial filing fee, is refunded.

The record further discloses from an affidavit made by David Levine, a former member of the city council, that the procedure for requiring payment of a filing fee plus 50 per cent of appraised value was pursuant to a motion passed by the city council on April 12, 1937. It appears that such action by the city council is not a matter of public record, and that the city has made such charges since 1937, without any ordinance ever having been enacted, either fixing the $100 filing fee or exacting payment of such portion of the appraised value.

The city's first assignment of error is to the trial court's judgments in behalf of the 10 plaintiffs who recovered the vacation charges exacted by the city, less the $100 filing fee.

The city argues that it is proper for the city to impose reasonable conditions in connection with the granting of street vacations which are for the public benefit, and the requirement of a fee equal to one-half the appraised value of the area sought to be vacated constitutes such a reasonable condition.

Neither the state statutes nor the city charter authorizes the imposition of such a condition for the consideration of a petition by the city council for the vacation of a Seattle city street. It appears obvious that the required payment of one-half the appraised value of the property is unrelated to any administrative cost; that it constitutes a compensation required by the city for a value enuring to the person seeking the vacation of the street abutting his property by reason of its vacation. This is an attempted sale of property to which the city has no fee.

■ We have never departed from the rule of law first stated by the Territorial Court 98 years ago in *Burmeister v. Howard,* 1 Wash. Terr. 207, 211 (1867):

> [W]hen an easement is taken as a public highway, the soil and freehold remain in the owner of the land encumbered only with the right of passage in the public; and upon a discontinuance of the highway, the soil and freehold revert to the owner, and in the case of streets and alleys, the proprietors of adjacent lots own the soil to the middle of the street, subject only to this right of passage in the public; and upon a discontinuance of such street or alley, the adjacent owners of lots on each side take the soil to the middle of the street.

See, also, *Nystrand v. O'Malley,* 60 Wn.2d 792, 375 P.2d 863 (1962). RCW 35.79.040 expressly states that vacated streets "shall belong to the abutting property owners."

If the easement for public travel has any value to the city, the street may not be legally vacated. RCW 36.87.060 provides in part:

> If the county road is found useful as a part of the county road system it shall not be vacated, but if it is not useful and the public will be benefited by the vacation, the board may vacate the road or any portion thereof.

This statute applies to counties, but the decisional law applying to cities is the same. *Young v. Nichols,* 152 Wash. 306, 278 Pac. 159 (1929); 25 Am. Jur. *Highways* § 119, at 416.

The city has nothing to sell in such case. 11 McQuillin, Municipal Corporations § 30.189, at 134 (3d rev. ed.), states:

> A municipality is not entitled to compensation for loss of a public easement in streets in which it does not own the fee. It thus follows, where a street is vacated by a court on the application of abutting landowners, the municipality has no such proprietary interest therein as to entitle it to compensation.

■■ This exact issue was before the Supreme Court of Illinois in *Lockwood & Strickland Co. v. Chicago,* 279 Ill. 445, 117 N.E. 81 (1917), in which the court struck down an ordinance of the city of Chicago requiring payment of $2,694 for vacation of an alley under guise of a fund to indemnify the city against damages arising from the vacation. The court said, at 449:

> The legislative powers of a city must be exercised for the public benefit, but that does not authorize a municipality to sell or bargain legislation as a means of obtaining revenue. It would be a novel proposition to hold that a city, as a condition precedent to the exercise of its lawful power and authority to vacate a street or alley no longer needed for public use, could demand and receive from private parties a sum of money for its action. Such a holding would be dangerous in principle, contrary to good morals and against public policy.

Moreover, in the instant case, the city of Seattle has required the payments in question without the enactment of an ordinance as required by its city charter for the exercise of legislative authority.

The charter of the city of Seattle, Art. 4, § 7, provides that "Every legislative act of said city shall be by ordinance. . . ." Art. 4, § 14 enumerates in detail the legislative powers of the city and provides that such powers shall be exercised by ordinance *"and not otherwise."* (Italics ours.)

RCW 35.22.020 requires that the manner in which cities of the first class shall exercise the powers conferred upon

them by law, with respect to their own government "shall be as provided in the Charters thereof." Also, see, *New Seattle Chamber of Commerce v. Seattle*, 88 Wash. 620, 153 Pac. 351 (1915); 5 McQuillin, Municipal Corporations § 15.03, at 57.

Therefore, the 1937 motion as a legislative act constituted an unlawful exercise of legislative authority.

The city further contends the trial court erred in granting each of the 10 plaintiffs judgment for recovery of sums paid less the $100 filing fees for the reason that the payments were made voluntarily.

The city relies on the rule of law that disallows recovery of voluntary payments when paid to satisfy an unauthorized demand, unless the one demanding the payment has induced it through coercion or fraud.

■ This case does not present the usual factual situation which exists in cases of voluntary payment in transactions between individuals. In such cases, the general rule applies that

> [A]s between individuals, money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability. 40 Am. Jur. *Payment* § 205, at 856.

When, however, a citizen makes payment of an illegal demand by one holding an official position, in order to secure a legal right which such citizen may lawfully exercise, then there is an exception to the general rule.

The exception to the rule and the reasoning therefor are correctly stated in the text and footnote in 40 Am. Jur., as follows:

> The courts generally favor the view that if an illegal demand is made by a person holding an official position, with the color of authority to enforce it, and such demand operates as a restraint on the exercise of an undoubted right or privilege, and in its enforcement there is no opportunity of contesting its validity, a payment of

the demand in order to remove such restraint is compulsory, and not voluntary. 40 Am. Jur. *Payment* § 176, at 835.

The reason underlying the rule is that the officer and the public who have business to transact with him do not stand on an equal footing. It is his special business to be conversant with the law under which he acts, and to know precisely how much he is authorized to demand for his services; but with them it is different. They have neither the time nor the opportunity of acquiring the information necessary to enable them to know whether he is claiming too much or not, and as a general rule, relying on his honesty and integrity, they acquiesce in his demands. . . . *American S.S. Co. v. Young*, 89 Pa 186, 33 Am Rep 748, affirmed, without ruling on this point, in 105 US 41, 26 L ed 966. 40 Am. Jur. *Payment* § 176 note 7, at 835.

The facts in the instant case, when considered with our street vacation statutes, come clearly within this exception. The motion made in 1937 establishing the policy pursuant to which these exactions were made provided that "No petition for the vacation of any street . . . shall be granted . . . until and unless the petitioners" shall pay the sums required by the city. The requirement for payment as a prerequisite to the introduction of the vacation ordinance is stated in the form letters mailed to petitioners by the city engineer: "The ordinance effectuating this vacation will not be introduced in the city council until receipt" of the sum demanded. "You have until March 26 to complete this transaction. Unless the matter is settled by that date, the vacation will be indefinitely postponed and the transaction terminated." RCW 35.79.010 and 35.79.030 provide that when a petition to vacate a street is signed by the owners of more than two-thirds of the private property abutting upon the part of the street sought to be vacated, the petition shall be heard. These sections of the statute make mandatory the rights of property owners so petitioning to be heard by the city council. An exaction of money by the city under the above circumstances from the plaintiffs to secure their right so given by statute constituted an

230

involuntary payment. The city's other arguments as to the voluntariness of payment are without merit.

■ The city further argues that there can be no recovery by the plaintiffs because the payments were not made under protest. This is not a case where payment under protest is a prerequisite for recovery as in a taxpayer's suit. A party faced with an exaction of money as in the instant case is not required to pay under protest or bring mandamus or other action as a prerequisite to the right of recovery of money so paid. *Trower v. City & County of San Francisco*, 157 Cal. 762, 109 Pac. 617 (1910). See, also, *Diocese of Fargo v. Cass Cy.*, 28 N.D. 209, 148 N.W. 541 (1914).

■ The city claims error in the allowance of interest from date of payment as provided in the summary judgment. The plaintiffs' right to recover interest is supported by prior decisions of this court. *Doric Co. v. King Cy.*, 59 Wn.2d 741, 370 P.2d 254 (1962), and cases cited therein.

The city assigns error to the trial court's failure to dismiss all of the plaintiffs' claims, because of their failure to comply with Art. 4, § 24 of the charter of the city of Seattle requiring the filing of claims for damages within 30 days after the time when such claim accrues. The city claims that filing such a claim is a condition precedent to each plaintiff's right to bring a cause of action in this case.

■ The city's contention would be well founded if the plaintiffs' claims could be deemed actions for recovery of damages. However, plaintiffs' claims in this case do not seek recovery of damages from the city. The city's identical contention was answered adversely to the city's position in *Byram v. Thurston Cy.*, 141 Wash. 28, 251 Pac. 103, 252 Pac. 943 (1926).

In *Puget Constr. Co. v. Pierce Cy.*, 64 Wn.2d 453, 456, 392 P.2d 227 (1964), the court makes this comment on *Byram v. Thurston Cy.*, supra:

Plaintiff relies heavily upon our decision in *Byram v. Thurston Cy.*, 141 Wash. 28, 251 Pac. 103, 252 Pac. 943 (1926), which says, *inter alia*, that only those cases

sounding in tort and giving rise to actions for damages are contemplated by the above statute. But *Byram*, while giving a measure of comfort to plaintiff, does not support its position. Byram brought suit to recover from the county taxes illegally assessed, paid under protest, and wrongfully kept. This court did not see the action as arising either ex contractu or ex delicto or as an action for damages, but rather one to restore money illegally obtained by an agency of government. Labeling the action does not reveal its real nature. As we said:

" . . . Such funds are 'moneys got through imposition,' and the obligation to do justice rests upon all persons, natural or artificial; and, if the county obtains money or property from others without authority of law, [the law] independent of any statute compels restitution or compensation."

This is an action for money had and received. Such action lies when one has money in his hands which he is not entitled to retain as against another. Such an action is based on quasi contract, or contract implied in law. *King Cy. v. Odman*, 8 Wn.2d 32, 111 P.2d 228, 133 A.L.R. 1440 (1941). Such action is not a claim for damages, but rests on equitable principles. *Bosworth v. Wolfe*, 146 Wash. 615, 264 Pac. 413, 56 A.L.R. 1117 (1928); *Seekamp v. Small*, 39 Wn.2d 578, 237 P.2d 489 (1951). In this type of action, no claim need be filed under the provision of the Seattle city charter. *Byram v. Thurston Cy., supra.*

The cross-appeal of the plaintiffs asserts that the trial court erred in dismissing the claims of Topp and West Seattle Congregational Church because of the bar of the statute of limitations.

The city and the plaintiffs agree that the 3-year statute of limitations, which limits the time for commencement of actions upon implied contracts, applies in this case. The sole controversy is over the date upon which the cause of action of the two plaintiffs above named accrued. They admit that their payments to the city were made more than 3 years prior to April, 1960, the date of commencement of the action. It is their contention that the 3 years should run from the effective date of the vacation ordi-

nances since the payments were conditioned upon passage of the ordinances.

■ We agree. The payments did not become final until the passage of the ordinances. It is undisputed that the money paid to the city would be returned to the plaintiffs in the event the street vacation ordinances were not passed, and that prior to the passage of the ordinances the plaintiffs could voluntarily withdraw their payments in lieu of the consideration of their petitions. Thus, the payments did not become final and the cause of action for their return did not accrue until the passage of the vacation ordinances. The trial court therefore was in error when it dismissed the claims of Topp and West Seattle Congregational Church as being barred by the statute of limitations.

The plaintiffs (cross-appellants) contend the trial court erred by dismissing with prejudice the third cause of action in King County Cause No. 599874, wherein they were seeking to establish a class action in behalf of 92 persons, who, it is claimed, paid the city within the statutory period one-half the appraised value of the property vacated by the city, less the $100 fee. Of these 92, 12 joined as plaintiffs in this action and 28 more now have independent actions pending against the city.

Prior to the commencement of this action, the President of Puget Sound Alumni of Kappa Sigma, Inc., wrote a letter to these 92 persons requesting that they join in the proposed action against the city and advising them that "only those joining as parties plaintiff can recover the moneys we believe were wrongfully paid, if the court finds the charge illegal." He was correct in this statement.

Class actions are provided for in Rule of Pleading, Practice and Procedure 23, RCW vol. 0. Effective on January 1, 1960, we adopted Federal Rule 23(a) and 23(c) without change and Rule 23(b) with only a slight modification, necessary to conform to state practice. Rule 23(a) provides:

> *Representation.* If persons constituting a class are so numerous as to make it impracticable to bring them all before the the court, such of them, one or more, as will fairly insure the adequate representation of all may, on

behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

(1) Joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

(2) Several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

(3) Several, and there is a common question of law or fact affecting the several rights and a common relief is sought.

■ Shortly after Federal Rule 23 was promulgated in the Preliminary Draft of the Federal Rules of Civil Procedure, Professor Moore applied a somewhat unique nomenclature to the three types of class actions provided for under Rule 23(a). He applied to the class suit brought under Rule 23(a)(1) the designation of "true" class action, to the suit brought under Rule 23(a)(2) the name "hybrid" class action and, to a claim brought under Rule 23(a)(3) the title "spurious" class action. Moore, Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft, 25 Geo. L.J. 551, 570, *et seq.* While such terminology has been criticized, 2 Barron & Holtzoff, Federal Practice and Procedure § 562 (rules ed.), most courts use the Moore terminology only as a handy labeling device and not as truly descriptive, and we do likewise.

We are not here concerned with the hybrid class action (a)(2), nor with the derivative claims authorized in (a)(1), but it is necessary to determine whether the claim which plaintiffs attempt to assert in behalf of all 92 persons is a true class action based on a right characterized as joint or common, or whether the claim is a spurious class action.

■ The correct classification of an asserted claim is dependent upon the jural relationship of the members of the class. It is this character of the right sought to be enforced for or against the class which determines its classification.

■ In the true class action, the character of the right asserted must be joint, common, or derivative. In this type of action, the joinder of all interested parties would be necessary except for the device provided by this rule of court. *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen,* 148 F.2d 403 (4th Cir. 1945). The term "common" in the rule has precipitated problems.

> The principal difficulty is caused by the inclusion of "common" rights. The term "common" has not previously been used in connection with joinder of parties. The courts and the learned writers have had difficulty in defining when a right is "common," and the class suit thus "true," and when it is merely "several," and the suit thus "hybrid" or "spurious." 2 Barron & Holtzoff, Federal Practice and Procedure § 562.1, at 267 (Rules ed.).

Characteristic of an action based on common rights is *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 65 L. Ed. 673, 41 Sup. Ct. 338 (1921). In that case, it was determined that an action brought by policyholders against a fraternal benefit association attacking the association's reorganization plan as inimical to the interest of all policyholders, was based upon a common right, and the decree entered was conclusive and binding upon all persons having such common rights, even though not parties to the action. This action was under Federal Equity Rule 38 which, in 1937, became, in effect, Rule 23(a) 1.

■ The spurious class action is well characterized by Professor Moore as follows:

> The spurious class suit is a permissive joinder device. The presence of numerous persons interested in a common question of law or fact warrants its use by persons desiring to clean up a litigious situation. While a purist may not liked to have the third type of class action termed spurious, this label serves to direct attention to the practical realities of litigation. The character of the right sought to be enforced for or against the class is
>
> "(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."
>
> There is no jural relationship between the members of the class; unlike, for example, the members of an unin-

corporated association, they have taken no steps to create a legal relationship among themselves. They are not fellow travellers by agreement. The right or liability of each is distinct. The class is formed solely by the presence of a common question of law or fact. When a suit is brought by or against such a class, it is merely an invitation to joinder—an invitation to become a fellow traveller in the litigation, which may or may not be accepted. It is an invitation and not a command performance. Assume that a railroad negligently sets fire to property, and widespread damage to many property owners ensues. Here there is a question of law or fact common to many persons. *A, B,* and *C* bring an action on behalf of themselves, and all others similarly situated, against the railroad. 3 Moore, Federal Practice § 23.10(3), at 3442 (2d ed.).

The distinction between the true class action and the spurious class action was well presented in *Rank v. (Krug) United States,* 142 F. Supp. 1 (1956), at 154, *et seq.* This was an action brought by landowners in California's San Joaquin Valley to enjoin the Bureau of Reclamation from interfering with the plaintiffs' riparian and overlying right to waters of the San Joaquin River. The plaintiffs did not seek to establish their respective separate rights to a given quantity of water, but sought only to establish a common right to a common source of water. The court determined, therefore, that the plaintiffs' action should be classified as a true class action under Rule 23(a)(1) and not an action to assert a "several" right under either subdivision (2) or (3) of that rule.

In the present case, the claims asserted against the city of Seattle do not have the characters of either joint or common right as used in class actions under Rule 23. Each claim for recovery differs upon the respective appraised values of the vacated streets abutting the respective properties. This is a spurious class action and the rights of absent parties may not be determined in this action. See *Elston v. King Cy.,* 178 Wash. 210, 34 P.2d 906 (1934), referred to by Professor Orland as illustrative of a spurious class action brought long before the adoption of Rule 23. 3 Orland, Wash. Prac., at 707.

The city asserts error in the granting of a permanent injunction enjoining the city from making future charges in connection with street vacations such as the trial court held illegal in this action. In oral argument, the plaintiffs admitted that the issuance of such injunction should not be sustained unless the court determined that this is a true class action.

In view of our determination that this is a spurious class action, this court will accept the plaintiffs' position on this assignment of error and will vacate and dissolve the injunction.

The judgment dismissing the claims of plaintiffs Topp and West Seattle Congregational Church is reversed, with direction that recovery be allowed as in the case of the other 10 plaintiffs, according to the sums paid less the $100 filing fees. The injunction against the city is vacated and dissolved. The judgment is otherwise affirmed. The plaintiffs will recover their costs on appeal.

HILL, DONWORTH, WEAVER, ROSELLINI, OTT, and HAMILTON, JJ., concur.

HALE, J. (dissenting)—The city of Seattle, according to estimates made by its counsel, granted 138 street vacations between April 1, 1960, and April 1, 1963, 92 of which required payment of a fee. Based on the city's time-honored formula of requiring the abutting owners to pay one-half the appraised value as a condition for vacating, the city, during this 3-year period, would have received $337,124.04, plus $100 for each vacation granted.

Thus, millions of dollars have probably come into the city treasury in this fashion since adoption of the formula by resolution in 1937. Under the majority decision, not only must a large sum of money be refunded to the abutting owners, but, more importantly, in all future street vacations, the municipal treasury will gain little or nothing when the city conveys its highly valuable tenure in real estate.

I see little authority for and no merit whatever in the proposition that, once a city has decided it has little use for

its property, it must give that property away. After all, a street to be vacated represents but one of many forms of surplus property from which the city should derive some consideration. The city's property belongs to all of its citizens; its officers and employees, whenever parting with anything the city owns, are bound in law to negotiate on behalf of their principal the best possible bargain, keeping ever in mind the municipality's best interests. The rule just announced in the majority opinion does violence to this idea; it compels the city to give away that which it acquired on behalf of the public for whom it holds all property in trust. Under the majority ruling, once the city has decided that the public service no longer needs the property, it not only must give it to a special class of persons strategically located to receive it, but, of more serious consequence, ask nothing for it on behalf of the beneficiaries for whom it was originally acquired.

If, as the majority seems to have done, we declare a rule that the city of Seattle, in vacating a public street and thereby surrendering to adjoining owners its valuable rights in real property must do so without recompense to the public treasury, but, contrarily, must give such valuable property away to the abutting owners, I would characterize such a ruling with the borrowed hyperbole from *Lockwood & Strickland v. Chicago,* 279 Ill. 445, 117 N.E. 81 (1917),[1] cited by the majority, that "Such a holding would be dangerous in principle, contrary to good morals and against public policy."

I have no quarrel with the view that vacated streets shall inure to abutting property owners as expressed in RCW 35.79.040 (*Nystrand v. O'Malley,* 60 Wn.2d 792, 375 P.2d 863 (1962), affirming *Burmeister v. Howard,* 1 Wash. Terr. 207 (1867)), but cannot accept as a necessary corollary thereto that the city may not require of the abutting own-

---

[1]The Illinois legislature subsequently remedied this decision by authorizing cities to make a charge for street vacations. *People ex rel. Franchere v. Chicago,* 321 Ill. 466, 152 N.E. 141 (1926), upheld this right and in effect overruled the decision of *Lockwood & Strickland v. Chicago,* 279 Ill. 445, 117 N.E. 81 (1917).

ers a substantial recompense for such surrender. I see no rational connection between a law declaring that vacated streets belong to the abutting owners and a rule which forbids the city from seeking some compensation for parting with its property.

What the city is surrendering has, as the majority points out, been termed an easement, but, in my view, it represents a tenure in land that resembles a fee simple absolute and in some ways rights in land of an even stronger and more abiding nature than those of a fee ownership. The city's rights and interests in the streets, for example, cannot be vitiated for nonpayment of taxes.

Article 11, § 12, of the Washington State Constitution says:

> The legislature shall have no power to impose taxes upon . . . cities . . . or property thereof . . . .

Article 7, § 1, Washington State Constitution, in part declares that

> Property of the . . . counties, school districts and other municipal corporations . . . shall be exempt from taxation . . . .

Again, unlike private ownership in fee, the city's possessory rights in its streets may not be disturbed or infringed by adverse possession or prescription. *Commercial Waterway Dist. No. 1 of King Cy. v. Permanente Cement Co.*, 61 Wn.2d 509, 379 P.2d 178 (1963). The city cannot be forced to vacate. It enjoys an immunity from alienation and prescription unknown to fee simple tenure. The decision to vacate a public street under our statutes lies solely in the legislative authority of the city, a decision that body cannot be compelled to make even though the street is unimproved and unopened and the abutting owners show continuing occupancy and greater need of it than the public.

RCW 35.79 prescribes the exclusive method by which abutting owners may seek a street vacation and RCW 35.79.010 gives the legislative authority—the city council—sole discretion as to whether a petition to vacate shall be granted or denied. Thus, the council makes its

decision free of the coercive pressure that the municipality may have already lost its street by adverse possession or prescription. I would thus conclude that the city council, at the behest of abutting owners, can no more be forced to pass a street vacation ordinance, no matter how fair and reasonable it may be, than it could be compelled, as in *Besselman v. Moses Lake*, 46 Wn.2d 279, 280 P.2d 689 (1955), to pass a rezoning ordinance, for such enactments represent the exercise of legislative discretion.

Nor is the city's easement, as distinguished from private ownership in fee, subject to condemnation by other municipal corporations except pursuant to special statute. We said in *State ex rel. Cle Elum v. Kittitas Cy.*, 107 Wash. 326, 181 Pac. 698 (1919), that property which is devoted already to a public use by one municipal corporation may not be condemned for a different public use by another if the existing public use will be destroyed or markedly disturbed. 11 McQuillin, Municipal Corporations § 32.67 (3d rev. ed. 1964); 1 Nichols, Eminent Domain § 2.2 (3d rev. ed. 1964); Rhyne, Municipal Law § 17-3 (1957).

Finally, as a crowning manifestation of the city's superior tenure when compared to that of a fee ownership, we have its freedom from creditor's rights. The city's possession, easement and rights in the streets may not be impaired or abrogated for debts and defaults nor through execution, attachment or sequestration. No creditor's rights may run against the city's possessory rights. Thus, its easement is free of the one most harrowing and frequently fatal burdens from which privately held lands suffer perpetual jeopardy—compulsory sale under creditor's execution.

The tenure in land surrendered by a city in vacating a street, therefore, runs wide and deep, being subject neither to alienation or diminution for nonpayment of taxes, nor to adverse possession or prescription, nor by eminent domain from other municipal corporations except under special legislation, nor from such process of judicial compulsion as attachment, foreclosure or execution. The municipality's rights thus constitute a tenure amenable to no extraneous

compulsion and subject to alienation only through the council's legislative discretion. This means that, when the city vacates a street, it actually parts with and turns over to the abutting owners not a mere easement, but extremely valuable rights in land.

Therefore, the city ought not be allowed, much less be compelled, to yield its property without securing for its people maximum benefits therefrom, for the legislative act of vacating a street is an act of public business, and the public business should be transacted in the public interest on the best terms attainable. The streets, being held in trust for the public by the city, ought not be vacated unless for a public purpose. *Young v. Nichols*, 152 Wash. 306, 278 Pac. 159 (1929). But reversion to the abutters does not convert the transaction into one for a private benefit if the public benefit and purpose is likewise served (11 McQuillin, Municipal Corporations § 30.186a (3d rev. ed. 1964)), even though the benefits to the abutting owners may be greater and more direct than to the public.

Thus, although the courts recognize that street vacations are for a public purpose, they have not excluded the idea that greater benefits to private persons may accrue therefrom. Such public benefits as relief from responsibility for maintenance and repair, substitution of new routes to existing streets and improving access to others, or eliminating sources of liability for injuries and damage, while deemed public purposes or benefits derived from the vacation, along with other benefits, do not obscure the greater and more direct benefit inuring to the abutting owners whose freeholds gain a direct increment from the vacation. The statutes (RCW 35.79.010 and RCW 35.79.030) recognize this private benefit by providing that vacation proceedings may be initiated by petition of two-thirds of the owners of the abutting property and it is unlikely that such owners would bring such petitions unless they were convinced the vacation would be to their benefit.

Because RCW 35.79.040 and the decisional law protect the abutting owners by preventing the city from conveying

the streets to third persons or strangers once the city has decided upon the vacation, this ought not prevent the city from requiring remuneration or fee therefor on behalf of the public. Neither the statutes nor, so far as I can determine, do the decisions, prohibit payment of a reasonable and fair recompense as a condition to turning over to the abutting owners the public's property rights in the streets. After all, the value of such vacated lands derives in large part from the public's expenditures in developing the city—in building streets, alleys, parkways, boulevards, installing water, sewage and hydroelectric systems, maintaining libraries, parks, playgrounds and auditoriums, providing police and fire protection and public transportation, maintaining and staffing sanitary and medical facilities, rodent control agencies, and providing at public expense all of the other services and facilities so essential to life in a modern city.

This case illustrates the substantial value vacated streets may acquire with the passing years. Following are the amounts ordered refunded by the trial court as representing only one-half the market value of the lands reverting to the abutters:

| Plaintiffs | Amount | Date Paid |
|---|---|---|
| Puget Sound Alumni of Kappa Sigma, Inc., a Washington corporation Chris Berg, Inc. | $4850.00 262.50 2800.00 | Sept. 6, 1960 Aug. 8, 1960 Oct. 26, 1962 |
| Lee Martin and Loretta M. Martin, his wife, | 7900.00 | Nov. 7, 1960 |
| Samual Spilk and Victoria L. Spilk, his wife, | 8900.00 | Nov. 28, 1960 |
| John J. Neville and Alice Neville, his wife, | 3250.00 | Sept. 6, 1960 |
| Russell Mowry and Jane Doe Mowry, his wife, | 50.00 | Oct. 17, 1960 |
| Charles H. Davies and Joyce P. Davies, his wife, | 150.00 | June 8, 1961 |
| Thor S. Goodman and Josephine Goodman, his wife, | 1775.00 | July 24, 1961 |
| Paul J. Berlin and Pearl E. Berlin, his wife, | 510.00 | Dec. 20, 1962 |

I would think the city council derelict in its duties had it not exacted for the public, on whose behalf it functions, a reasonable recompense for surrendering the public's prop-

erty in lands having so substantial a worth, even though the surrender were in part for a public purpose. And I can think of no fairer way in determining whether the exaction be reasonable than to base it on the market value, as determined by a fair appraisal. Considering the value and benefit to the reverters, 50 per cent appears not unfair, although that, I would say, is largely a legislative question to be determined by the legislative body of the city and not by the courts.

The rationale of *Baxter-Wyckoff Co. v. Seattle,* 67 Wn.2d 555, 408 P.2d 1012 (1965), seems to me controlling of the instant case. There, two lumber companies for several years had occupied, maintained and used some industrial buildings erected on the land dedicated for Southwest Florida Street, Seattle—a street which, with minor exceptions, had not been opened to travel since its platting in 1897 or its annexation to Seattle in 1905. Pursuant to § 13 of ordinance No. 90047, the Board of Public Works of Seattle had been authorized to issue annual permits for the industrial and commercial use of unopened public streets and had adopted a schedule of fees calling for 10 cents per square foot for the first one thousand feet and 5 cents thereafter in one category and 5 cents per square foot for the first one thousand feet, reduced to 1 cent thereafter in another.

Under this schedule, Baxter-Wyckoff Lumber Company for several years paid to the city an annual permit fee of $2,156.60, and the Nettleton Lumber Company similarly paid $425.05. The case arose when, in 1958, the two companies refused to pay these annual permit fees, claiming that the fees demanded were illegal revenue-raising charges having no reasonable relation to the cost of administering, inspecting and policing connected with issuing the permits. The trial court, accepting plaintiffs' views, enjoined the city from making further collections of the annual permit fees, but without prejudice to recomputing and collecting them in an amount reasonably related to the costs of the administration, inspection and policing required in their issuance.

This court reversed. We said there that "The abutting landowner has no right to build permanent structures in the street nor to set up storage yards therein for private business purposes." In the present case, we should likewise say that the abutting owners have no right either to the occupancy or vacation of the street.

In *Baxter-Wyckoff*, we said:

> [T]he permit granted by the city to respondents in this case was the grant of a mere privilege, and that the use granted could be prohibited by the city absolutely or could be granted upon such terms and conditions as the city may see fit to impose.This is not a mere matter of municipal regulation. The conditions under which such a privilege will be granted by the city is a matter entirely within the discretion of the city council.
>
> The courts have never taken it upon themselves to review the appropriateness of imposing conditions on such a privilege nor to substitute their judgment for that of the municipal authorities.

We should say the same here for the abutting owners have no more power to compel a permanent transfer in the instant case than they had to enforce a temporary user in that case. Because vacation of a street rests exclusively with the power of the city council, acquisition by vacation is a mere privilege in the instant case in the same way that temporary occupancy was in the *Baxter-Wyckoff* case. In *Baxter-Wyckoff*, we approved of an annual fee for temporary uses of the vacant street; why should there be no fee at all for a permanent surrender of the same property?

Our language concluding the *Baxter-Wyckoff* case, *supra,* is susceptible of direct application in the present cause:

> Since, as we have seen, the city has plenary power to refuse to permit any person to build or maintain, in a public street, a permanent structure for use in the conduct of his private business, it follows that the city may charge such fees and impose such other conditions with respect to such use as it deems proper. Consequently, the courts may not enjoin the collection of fees by the city therefor regardless of the amount thereof. Ordinance No. 90047 is admitted to be valid and we are of the opinion

that the fees charged respondents for the permits issued thereunder may not be reviewed by the courts.

Finally, no statute has come to my attention which forbids the city from requiring a payment into the city treasury for vacating the lands and yielding to the abutting owners on their petition the city's tenure in the streets. The city, holding as it does all of its property in trust for all of its citizens is under a duty to exert its best efforts on behalf of the people it serves when surrendering any property or rights in property to any private person. I think the courts should sustain it in carrying out such a trust. See *State ex rel. Myhre v. Spokane, ante* p. 207, 422 P.2d 790 (1967), which sustains a contract under which the city accepted $75,000 from land developers to be spent on street construction in the area of a new shopping center.

Accordingly, I would reverse the judgment and order the case dismissed.

A few comments on the subsidiary points discussed by the majority seem appropriate. The want of a precise label for the exaction ought not affect its validity or operation. Whether it be termed a fee, rental, conditional stipend, payment, compensation, tax, permit, consideration, or whatever, has little to do with operation or legal effect. Its validity should be measured by ascertaining whether in exacting the fee the city acts within its corporate powers for a public purpose, not by the tag we may put upon it.

Another point: Since the resolution of 1937, under which the $100 filing fee and the one-half appraisal value required as condition precedent to vacation have in each instance been followed by a formal ordinance of vacation, I see no reversible defect in this time-honored procedure although I recognize that the city could in advance be judicially compelled to supplement that resolution with an ordinance or, in the alternative, abandon the procedures set up by it.

Finally, even though the resolution of 1937 under which the city operates be deemed an invalid exercise of the city's legislative authority, plaintiffs are not entitled to the relief sought. They ought not be allowed to simulta-

neously claim under it and denounce it as a nullity. They should be estopped from keeping the benefits under the resolution and at the same time claiming it void.

Respondents had several other avenues of procedural attack open to them in challenging the 1937 resolution: mandamus and prohibition, to prevent the city from considering further vacation in pursuance of it; bringing petitions in vacation before the city council under RCW 35.79 without reference to the resolution; or tendering a return of the land in rescission to obviate claiming under it. But, having eaten their cake, they ought not have it too. At the very least, basic equity requires a rescission and restoration of the streets to the city before and as a condition to ordering a refund of the money to the abutting owners.

The cause should be reversed and dismissed.

FINLEY, C. J., concurs with HALE, J.

*Reported in 422 P.2d 754.