[No. 51539-5. En Banc. July 2, 1987.]

MALL, INC., *Appellant,* v. THE CITY OF SEATTLE, *Respondent.*

*Ferguson & Burdell,* by *Henry C. Jameson,* for appellant.

*Douglas N. Jewett, City Attorney,* and *Judith B. Barbour, Assistant,* for respondent.

GOODLOE, J.—Appellant Mall, Inc., applied for permission to construct a 35–story building on the site of the Bartell Building in downtown Seattle. Its application was denied by the Seattle Department of Construction and Land Use (DCLU) because the building's proposed total floor area greatly exceeded the maximum allowed under the Seattle Municipal Code. The Seattle Hearing Examiner and trial court upheld the DCLU's interpretation. Mall contends on appeal that its fee interest in the land underlying Westlake Avenue, which lies adjacent to the site, should be included in the computation of its lot area, thereby increasing the allowable floor space in its proposed structure. We disagree. We hold that the code excludes streets from the definition of lot area. This exclusion holds true whether the street was created by dedication or, as in the case of Westlake Avenue, by power of condemnation. We affirm.

Mall's property is located in Seattle's downtown retail core. Until very recently, the property has housed a 2–story triangular building commonly referred to as the Bartell Building. The building sat alongside the Westlake Mall, a portion of Westlake Avenue now used as a pedestrian

shopping mall. The Westlake Mall project has been the subject of several lawsuits between the City of Seattle and Mall. *See In re Seattle,* 96 Wn.2d 616, 638 P.2d 549 (1981); *In re Seattle,* 104 Wn.2d 621, 707 P.2d 1348 (1985). In *In re Seattle,* 104 Wn.2d 621, *supra,* this court upheld the City's condemnation of Mall's property for use as a public park. This case is related to the condemnation case only in that resolution of this case may have an effect on the amount of compensation the City pays for Mall's property.

The area surrounding Westlake Mall in downtown Seattle was platted as A. A. Denny's Third Addition in 1869. Pine Street to the north of Mall's property and Fourth Avenue to the west were dedicated as streets at that time. Mall's chain of title is traceable back to 1902. In February of that year, Seattle authorized the creation of Westlake Avenue by condemnation in ordinance 7733. Final judgment was entered in a condemnation lawsuit in 1903. Portions of lots 1, 4, and 5 of block 19 were condemned for Westlake Avenue. For purposes of this proceeding, the parties have stipulated that the interest acquired by the City in Westlake Avenue is a street easement (rather than a fee). The parties' stipulations were accepted in full by both the hearing examiner and trial court. Since these fact findings remain unchallenged, they will be accepted as verities on appeal. *See Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.,* 96 Wn.2d 806, 814, 638 P.2d 1220 (1982); *Yakima Cement Prods. Co. v. Great Am. Ins. Co.,* 93 Wn.2d 210, 213, 608 P.2d 254 (1980).

Following the condemnation, Mall's predecessors in interest conveyed portions of lots 4 and 5 lying easterly of Westlake Avenue to third parties. Mall acquired title to its property by a statutory warranty deed dated March 14, 1963. The deed describes Mall's property as "[t]hat certain triangular piece of real estate lying on the west side of Westlake Avenue in the City of Seattle, being parts of lots 1, 4 and 5, in block 19, Addition to the Town of Seattle, as laid out by A. A. Denny". Exhibit 1. The parties have stipulated that the deed contains an accurate description of

Mall's property. The following diagram illustrates Mall's property as described in the deed.

Although not expressed in the deed, the parties have further stipulated that Mall owns an underlying fee to the full portion of Westlake Avenue stretching across lots 1, 4 and 5. Since no assignment of error was made, this stipulation must also be accepted as verity on appeal. *See Painting & Decorating Contractors,* at 814; *Yakima Cement Prods.,* at 213. Reconciling this stipulation with the deed, at most it can be said that Mall's interest in the property

underlying Westlake Avenue is by virtue of its predecessor's interest and not due to any recorded transfer of rights.

In August of 1983, Mall applied for a Master Use Permit to demolish the Bartell Building and to construct a 35-story building devoted to mixed retail, office, and residential use. The Seattle Municipal Code regulates the size of buildings through a "floor area ratio" (FAR) formula. The "Metropolitan Business Zone" regulations govern Mall's property.[1] *See* SMC 24.06.070(D); 24.12.020. In the Metropolitan Business Zone, the code specifies that the gross floor area of a structure "shall not exceed ten (10) times the lot area". SMC 24.46.110(A).

Mall computed the floor area for its proposed 35-story building based on its fee ownership of 4,170 square feet of land underlying the Bartell Building and an estimated 11,056 square feet of land underlying the easement for Westlake Avenue, a total of 15,226 square feet. The proposed building's total floor area was approximately 150,000 square feet.

The director of DCLU issued a decision on December 2, 1983, denying the Master Use Permit for the 35-story building. The director ruled that Mall's total lot area under the code was 4,170 square feet; *i.e.,* that portion of Mall's fee ownership bounded by Westlake Avenue, Fourth and Pine. Thus, the director concluded, Mall's proposed building was limited by the FAR requirement to a maximum floor space of 41,700 square feet, or approximately 12 stories.

A hearing was held before the Seattle Hearing Examiner whose findings and decision affirmed the decision of the director. Mall then filed an application for writ of certiorari

---

[1]The zoning designation has since been changed from "Metropolitan Business" to "Downtown Retail Core". *See* SMC 23.04.010; 23.30.010. The Downtown Retail Core zoning was adopted as part of the phased replacement of Title 24, the zoning code, by Title 23. *See* SMC 23.04.010. All references to Title 24 zoning provisions in this opinion are those in effect at the time of Mall's permit application. Although the zoning regulations for the property at issue have changed, density in the retail core is still regulated by FAR. *See* SMC 23.49.098.

with the King County Superior Court. The trial court affirmed the hearing examiner. Mall appealed directly to this court.

The standard of judicial review of zoning actions is whether the action was "'arbitrary, capricious, or contrary to law.'" *Lewis v. Medina,* 87 Wn.2d 19, 22, 548 P.2d 1093 (1976) (quoting *Reiger v. Seattle,* 57 Wn.2d 651, 653, 359 P.2d 151 (1961)); *Murphy v. Seattle,* 32 Wn. App. 386, 389–90, 647 P.2d 540 (1982); *see* RCW 7.16.120. This appeal involves an issue of law only, the correct interpretation of terms in the Seattle Municipal Code. We review de novo the written record of the administrative hearing. *Murphy,* at 390.

The agreed issue before us is whether Seattle zoning law allows a landowner to count that portion of his land which is encumbered by a condemned street easement in computing the allowable floor area for a structure. More specifically, does "lot area" as defined in the Seattle Municipal Code include a landowner's underlying fee interest in a condemned street?

I. The Ordinary Meaning and Agency Interpretation of the Code Term "Lot Area"

The gist of Mall's argument is that because condemned street easements are not expressly excluded from the code's definition of lot area, they must be included. This argument overlooks the plain meaning and purpose of the code and distorts the well established common law and everyday understanding of the word "lot". Mall would have us redefine "lot" to include certain public streets, despite the code's clear expression and intent that "lot" and "street" should be distinct.

For the downtown Metropolitan Business Zone, the FAR formula is defined in relevant part as follows:

> The gross floor area of any structure . . . shall not exceed ten (10) times the *lot area* . . .

(Italics ours.) SMC 24.46.110(A). Resolution of this dispute turns upon the meaning of "lot area", which is defined as

"the total horizontal area within the *lot lines* of a lot." (Italics ours.) SMC 24.08.130(4). "Lot lines" are defined in turn as "the *property lines* bounding a lot." (Italics ours.) SMC 24.08.130(12).

██ Thus, the code leads us to rely on the term "property lines" to determine what is included within lot area. Since "property lines" are not expressly defined by the code, one must look to their common and ordinary meaning. *See Dominick v. Christensen,* 87 Wn.2d 25, 27, 548 P.2d 541 (1976); *Gaylord v. Tacoma Sch. Dist. 10,* 88 Wn.2d 286, 291, 559 P.2d 1340, *cert. denied,* 434 U.S. 879 (1977). Property lines are commonly understood as those lines which separate one's lot from adjoining lots or the street. *Linneman Constr., Inc. v. Montana–Dakota Utils. Co.,* 504 F.2d 1365, 1369 (8th Cir. 1974); *Loveladies Property Owners Ass'n v. Barnegat City Serv. Co.,* 60 N.J. Super. 491, 502–03, 159 A.2d 417 (1960); *Ujka v. Sturdevant,* 65 N.W.2d 292, 294 (N.D. 1954); *Gage v. Chicago,* 223 Ill. 602, 605, 79 N.E. 294 (1906); 34A Words and Phrases, *Property Line,* at 323 (1957). This understanding of property lines is consistent with the code's definition of "lot" as a "parcel of land . . . abutting by not less than twenty feet (20') upon a street", SMC 24.08.130(3), and of "front lot line" as "the lot line separating the lot from the street", SMC 24.08.130(10). *See also* SMC 24.08.130(5), (10), and (15) (defining "corner lots" in relation to street boundaries). Since property lines bound a lot, and a lot extends only so far as the adjoining lot(s) and street(s) upon which it abuts, the code's definition of "lot" sets the outer limits for code purposes at which "property lines" or "lot lines" may lie. This interpretation also comports with the position of the DCLU: "[W]hen the street comes into being, the property line becomes that line that separates the street from the lot." Hearing Examiner Transcript, at 77 (Feb. 7, 1984).

Mall does not directly quarrel with the proposition that property lines run between a lot and abutting street. Yet, Mall would have us limit the above rule to dedicated streets

based on its erroneous position that "property lines", for zoning code purposes, constitute the boundaries defining fee ownership. Although intuitively appealing, this broader definition of property lines nullifies the very distinction Mall offers between condemned and dedicated streets. Mall seems to forget that a landowner whose property adjoins a dedicated street easement also owns a portion of the street property in fee. *Puget Sound Alumni of Kappa Sigma, Inc. v. Seattle,* 70 Wn.2d 222, 226, 422 P.2d 799 (1967) (citing *Burmeister v. Howard,* 1 Wash. Terr. 207, 211 (1867)). Landowners with property abutting dedicated streets hold a reversionary fee interest to the center line of the street. *Roeder Co. v. Burlington Northern, Inc.,* 105 Wn.2d 567, 716 P.2d 855 (1986); RCW 35.79.040. If one were to apply Mall's definition of property lines so as to include condemned street easements in lot area, dedicated street easements would logically have to be included as well. Since the vast majority of Seattle streets, regardless of how acquired, are easements in which the abutter owns an underlying fee, nearly every landowner in the city could increase his FAR (and circumvent numerous other code requirements) by simply asserting his reversionary interest in the adjacent street. In short, allowing "property lines" to include all fee ownership in the technical sense renders the zoning code meaningless as a bulk and density control. *See, e.g., Beatrice v. Williams,* 172 Neb. 889, 112 N.W.2d 16 (1961).

The DCLU's guidelines for drawing plot plans, upon which Mall relies, are not determinative on the question before us. See exhibit 14 (DCLU Information Bulletin 103). The DCLU guidelines are not law. They cannot supersede the zoning code. The guidelines simply inform the homeowner of the requisite information—including the demarcation of all easements and abutting streets—to include on a plat. The guidelines advise that property lines are the "legal dimensions of [one's] property", a conception which may vary according to the purpose at hand. Exhibit 14, at 7. It has been stipulated that Mall owns a reversionary interest to a portion of Westlake Avenue and it is undis-

puted that Mall owns a portion up to the center lines of Fourth Avenue and Pine Street. *See Roeder Co. v. Burlington Northern, Inc., supra; Puget Sound Alumni of Kappa Sigma, Inc.,* at 226; *Gillis v. King Cy.,* 42 Wn.2d 373, 377–78, 255 P.2d 546 (1953). However, such interests are mere future expectancies, "bereft of enjoyment and incapable of pecuniary advantage". *In re New York,* 278 N.Y. 163, 173, 15 N.E.2d 563 (1938). As such, they cannot be considered part of Mall's developable "lot area" under the code. Indeed, Mall's deed overlooks these limited interests and describes the property in question as lying to the west of Westlake Avenue and bounded by Westlake, Fourth Avenue and Pine. Exhibit 1. When Mall purchased the property, Westlake Avenue had been a street for 60 years. Thus, Mall never had a realistic expectation of using the street property for pecuniary gain.

Moreover, it is questionable whether Mall's claim to fee ownership of the full width of Westlake Avenue, although stipulated as fact by the parties, is sustainable as a matter of law. When Westlake Avenue was formed by condemnation in 1903, Mall's predecessors in interest received full compensation for the property. Nowhere does Mall's deed show a transfer of any rights in such land to Mall. If the street were now to be vacated, landowners on the east side of Westlake Avenue would have a cognizable claim to one–half of the street property. *See* RCW 35.79.040 (if any street or alley is vacated by the city, the affected property shall belong to the abutting property owners, one–half to each); *see also Seattle v. Hinckley,* 67 Wash. 273, 278–79, 121 P. 444 (1912); *Burmeister,* at 211–12. In short, nothing in the facts demonstrates that Mall's interest in Westlake Avenue is any greater than that of any landowner in any adjacent street.

More instructive than the DCLU guidelines are the decisions rendered by both the DCLU Director and Hearing Examiner that Mall's lot area does not include Westlake Avenue. It is a well established rule of statutory construction that considerable judicial deference should be

given to the construction of an ordinance by those officials charged with its enforcement. *Keller v. Bellingham,* 92 Wn.2d 726, 731, 600 P.2d 1276 (1979); *Morin v. Johnson,* 49 Wn.2d 275, 279, 300 P.2d 569 (1956). In the context of a zoning case, this court has explained the reasons for this rule of deference as follows:

> The primary foundation and rationale for this rule is that considerable judicial deference should be accorded to the special expertise of administrative agencies. Such expertise is often a valuable aid in interpreting and applying an ambiguous statute in harmony with the policies and goals the legislature sought to achieve by its enactment. At times, administrative interpretation of a statute may approach "lawmaking," but we have heretofore recognized that it is an appropriate function for administrative agencies to "fill in the gaps" where necessary to the effectuation of a general statutory scheme. It is likewise valid for an administrative agency to "fill in the gaps" via statutory construction—as long as the agency does not purport to "amend" the statute.

(Citation omitted.) *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 448, 536 P.2d 157 (1975). In *Hama Hama,* as in the present case, the administrative agency's interpretation of a zoning code disfavored the involved property owners. Nevertheless, it was upheld on the principle of judicial deference.

Mall argues that this rule of deference must give way to the rule that ambiguous zoning ordinances are to be strictly construed in favor of property owners. *See, e.g., Morin,* at 279. Yet such preference to property owners is only warranted to the extent ambiguity exists. Here, there is no ambiguity. The code's definition of "lot area" clearly excludes streets. Furthermore, zoning ordinances are to be liberally construed so as to effectuate their intent. *Dando v. King Cy.,* 75 Wn.2d 598, 603, 452 P.2d 955 (1969). In light of the DCLU's long–standing expertise in calculating lot areas under the code, we uphold its interpretation.

The approach taken by the Court of Appeals in *East v. King Cy.,* 22 Wn. App. 247, 255, 589 P.2d 805 (1978) is

applicable here. In resolving a dispute over the meaning of a zoning code's undefined use of the term "campus", the court held first, that undefined, unambiguous terms in a statute are to be given their ordinary meaning, and second, that to the extent ambiguity exists, deference must be paid to the enforcing agency's interpretation. *East,* at 253–55. In the present case, the ordinary meaning and agency interpretation of "property lines" both yield the same result: the property lines bound Mall's lot area at the street.

## II. The Intent of the Code's Drafters

Mall further argues that its interpretation of the code should be adopted because it is the interpretation most consistent with the drafter's intent. Mall argues that the purpose of the code's FAR regulations is to control bulk and density within each given block. The density within block 19, in which Mall's property is located, would be no greater after construction of a 35–story building than the density permitted in all other square city blocks. The fact that block 19 is now intersected by Westlake Avenue, Mall argues, should not prevent it from being developed to the same density as all other city blocks.

We agree with Mall that it can be helpful to construe the code as a whole with regard to its drafter's intent. *See Dando,* at 603. As this court has often recognized, a literal reading must sometimes give way to the spirit or intent of the legislation to "avoid unlikely, strained or absurd consequences which could [otherwise] result". *Alderwood Water Dist. v. Pope & Talbot, Inc.,* 62 Wn.2d 319, 321, 382 P.2d 639 (1963); *accord, State v. Keller,* 98 Wn.2d 725, 728, 657 P.2d 1384 (1983). Yet, we cannot accept Mall's contention that the inclusion of streets within lot area is consistent with the code's demonstrated intent. To the contrary, the language throughout the code demonstrates a legislative intent to separate streets from lots.

For instance, SMC 24.46.110(A), prescribing the rules for calculating FAR, specifically notes that commonly owned lots which are adjacent or across an abutting alley may be

linked for purposes of computation. Alleys, like streets, are normally created as easements to which the abutting landowners possess an underlying fee. *Burmeister v. Howard, supra.* Naturally, if the landowner's fee interest in an abutting alley were automatically included within his "lot area" under the code, no special provision for alleys would be needed. SMC 24.46.110(A) makes no special provision for property abutting streets. The expression of one thing in a legislative enactment excludes others not expressed. *Dominick v. Christensen*, 87 Wn.2d 25, 26, 548 P.2d 541 (1976). Therefore, SMC 24.46.110(A) should be read to preclude the inclusion of street property in one's lot area.

Reference to the code's residential zone regulations is also instructive. Certain provisions, meant to ease hardship to some lots, permit reference to abutting streets for computation of lot area, as follows:

24.62.050 Lot area modifications.

In the case of a corner lot, or a lot a side lot line of which abuts upon a street, place, or alley, the width of the lot may be increased by one–half (1/2) the width of the abutting side street, place, or alley, for the purpose of computing the number of dwelling units permitted in multiple dwellings of more than three (3) units, provided that no lot width used in such computation shall exceed seventy–five feet (75') and that no lot area used in such computation shall exceed by more than twenty–five percent (25%) the actual net area of such lot.

24.62.170 Lot coverage—Exceptions for corner lots.

In the case of a corner lot or a lot, a side lot line of which abuts upon a street, place, or alley, the width of the lot may be increased by one–half (1/2) the width of the abutting side street, place or alley for the purpose of computing the lot coverage only, provided that no lot area used in such computation shall exceed by more than twenty–five percent (25%) the actual net area of such lot.

The inclusion of these exceptions in residential but not in other zones demonstrates a conscious legislative intent to exclude streets from lot area computation in the Metropolitan Business Zone. It further demonstrates a general

legislative scheme to use street lot lines as a means of prescribing bulk and density limitations.

The overriding purpose of the code's zoning scheme is to promote the public health, safety, and general welfare through means of bulk and density controls and certain use requirements. These controls are designed to ensure, among other things, the provision of adequate light, air, access, and space. SMC 24.06.020. Although there are no express open space or setback requirements in the Metropolitan Business Zone, the FAR requirements help to ensure the preservation of open space by regulating development density within each lot. As the code was enacted with the existing network of streets in mind, FAR regulations were clearly designed to ensure adequate open space on private land *in addition to,* and *in relation to,* that already provided by the public streets.

The code's FAR bonus system, SMC 24.46.110(B), helps demonstrate this purpose. The bonus system allows the construction of additional floor space to developers who will develop plazas, arcades, and voluntary setbacks on their property. These public amenities must not only exist within the lot area at a specified range of distance from the abutting street, *see* SMC 24.08.020(A)(8) and 24.08.230(V)(2), but also are evaluated to ensure that they "relate well to the street and contribute to a desirable street environment". SMC 24.46.110(B)(1)(b). The FAR bonus system refutes Mall's assertion that the code drafters intended every square block in the downtown area to be of uniform density. Rather, the code, construed as a whole, makes it clear that downtown densities will *vary* depending on the differing size and shape of properties cut by the intersecting streets and according to what additional open space the developer will provide. In any event, including Westlake Avenue within Mall's lot area would not promote uniform density; it would permit an unjustifiable *increase* in building density on Mall's triangular block.

III. Condemned Street Easements versus Dedicated Street Easements and Street Easements versus Private Easements under the Code

Finally, Mall argues that the DCLU and hearing examiner erred in according different treatment to street easements and private easements under the zoning code. Historically, Seattle has allowed property owners to include private easements for access and utilities in computing floor area. The DCLU director reasoned that street easements are to be treated differently from private easements because the former are more severe encumbrances on property. Mall argues that this distinction between street and private easements is unjustified. Instead, Mall would have us distinguish between easements created by dedication and by condemnation. We decline to adopt Mall's approach.

There is no question that Westlake Avenue is a public street: the code defines "street" as a public way at least 30 feet wide permanently open to the public. SMC 24.08-.200(S)(12). Mall, however, would have us hold that Westlake Avenue is different from other streets because it is an easement and Seattle has traditionally allowed private easements, such as for access and utilities, to be included in lot area. In so arguing, Mall overlooks the fact that most Seattle streets, including dedicated streets, are easements. The mere fact that property is an easement, therefore, will not support Mall's proposed distinction between streets created by condemnation and by dedication.

Some jurisdictions have observed that a property line is drawn where the property abuts a "dedicated" street. *See, e.g., Linneman Constr., Inc. v. Montana–Dakota Utils. Co.,* 504 F.2d 1365, 1369 (8th Cir. 1974). Yet nowhere do such cases say that the result should be any different where property abuts a street created by condemnation. Indeed, the relevant cases invariably refer to "street" in its general and broadest sense. For example, the Supreme Court of Iowa states:

> "'Lot' and 'street' are two separate and distinct terms, and have separate and distinct meanings. The term 'lots', in its common and ordinary meaning, includes that portion of the platted territory measured and set apart for individual and private use and occupancy; while the term 'streets' means that portion set apart and designated for the use of the public, and such is the sense in which such terms will be presumed to have been used, unless it be made to appear that a contrary meaning was intended.'"

*Stockdale v. Lester,* 158 N.W.2d 20, 22 (Iowa 1968) (quoting *Montgomery v. Hines,* 134 Ind. 221, 225, 33 N.E. 1100 (1892)); *Loveladies Property Owners Ass'n v. Barnegat City Serv. Co.,* 60 N.J. Super. 491, 500, 159 A.2d 417 (1960); *In re Dixon,* 120 Cal. App. 635, 638, 8 P.2d 881 (1932); *Peake v. Azusa Vly. Sav. Bank,* 37 Cal. App. 2d 296, 301, 99 P.2d 382 (1940); *accord, California v. United States,* 169 F.2d 914, 919 (9th Cir. 1948); *Schenectady v. Trustees of Union College,* 144 N.Y. 241, 39 N.E. 67 (1894); 25A Words and Phrases, *Lot,* at 430 (1961).

Courts have long ago rejected the argument that the mere fact that a landowner holds title to an abutting public street easement entitles him to gain legal advantage by including a portion of the street within his "lot". For example, in holding that a 30–foot strip covered by a street could not be attached in determining the center line of a lot, the court in *Earl v. Dutour,* 181 Cal. 58, 60, 183 P. 438, 6 A.L.R. 1163 (1919) explained:

> However clearly it may appear that the owner of a lot holds title to the center of an adjoining street, subject to the public easement, and that the boundary of the lot is technically, therefore, the center of the street, in view of the fact that the owner of such lot or land has no right to the possession or occupancy of any portion of such public street, we are of the opinion that the word "lot," as generally and customarily used, does not include such portion of the street. *Wegge* v. *Madler,* 129 Wis. 412, [116 Am. St. Rep. 953, 109 N. W. 223].

*Accord, Hunter v. Roman Catholic Bishop,* 128 Cal. App. 90, 93, 16 P.2d 1048 (1932). These cases advance no theory to support Mall's argument that the law should be any dif-

ferent in the case of a street created by condemnation. In fact, the limited times this court has addressed the question in the context of street vacations, it has held that the means by which a city acquired its streets was of no legal consequence. *See Seattle v. Hinckley,* 67 Wash. 273, 278–79, 121 P. 444 (1912); *see also Burmeister v. Howard,* 1 Wash. Terr. 207, 211–12 (1867).

There is good reason for not distinguishing between condemned and dedicated street easements. In either case, the abutting landowner's interest is merely reversionary, *Gillis v. King Cy.,* 42 Wn.2d 373, 377–78, 255 P.2d 546 (1953), and extends no further than the center of the street, *Burmeister,* at 211–12. Until the street is vacated, its value to the landowner in both cases is nominal. *See California v. United States,* at 926; *In re New York,* 278 N.Y. 163, 173, 15 N.E.2d 563 (1938). The fee owner cannot use the property for private purposes without a special permit and may otherwise only make such use of the property as is permitted by city ordinances to the general public. *Baxter–Wyckoff Co. v. Seattle,* 67 Wn.2d 555, 560–61, 408 P.2d 1012 (1965); *see* 1 B. Elliott & W. Elliott, *Roads and Streets* § 482 (4th rev. ed. 1926). These restrictions hold true regardless of how the street was created. Since the fee owner's interests in condemned and dedicated street easements are identical, there is no rational basis for giving preferential treatment to the former.

In contrast, distinguishing between public and private easements is both justified under the code and precedented by common law. *See, e.g., Siegemund v. Building Comm'r,* 259 Mass. 329, 156 N.E. 852 (1927) (private way held not a "street" within meaning of local zoning ordinance relating to setback requirements). While the code manifestly demonstrates an intent to exclude streets from lots, no similar intent to exclude private easements can be derived. Based on its interpretations of the code, DCLU has routinely included private easements in its estimations of lot coverage. Because the owner of land subject to a private easement normally retains considerable rights to enjoyment

of the subjected property, exclusion of private easements from lot area calculations would be unfair to property owners in considerably lowering the value of servient estates. Exclusion of public easements, on the other hand, *is* fair because the owner of the burdened property has already been compensated for the property's full value as if he had sold it in fee outright. A distinction based on public versus private easements is therefore consistent with those rules of statutory construction on which Mall relies—that zoning ordinances are to be construed in favor of property owners and are not to be extended by implication to matters not clearly within their scope. *Morin v. Johnson,* 49 Wn.2d 275, 279, 300 P.2d 569 (1956).

It is true that some private easements may restrict the fee owner's rights as much as a street. Indeed, under certain circumstances some courts have recognized that a private road easement is for all practical purposes the functional equivalent of a public street. *See McConiga v. Riches,* 40 Wn. App. 532, 700 P.2d 331 (1985); *Loveladies,* at 501, 503 (construing *Weissmantel v. Sands Point,* 129 N.Y.S.2d 640 (Sup. Ct. 1954)). Yet, if the distinction between private and common use is occasionally a matter of degree (on which legislative clarification would be helpful), no such hairsplitting is required in the present case. Mall's interest in Westlake Avenue is unquestionably burdened by a public easement and, hence, is no different from Mall's center line interests in Fourth Avenue and Pine Street. These interests must all be excluded from Mall's lot area calculations.

Mall seems to want it both ways. On the one hand, it would have us hold that a condemned street easement must be included within lot area, because "'property lines' encompass [fee] ownership". Brief of Appellant, at 14. On the other, Mall would have us conclude that lot area excludes a dedicated street, despite recognition that the "fee ownership of the land beneath the street remains in the owner of the abutting property." Brief of Appellant, at 18. Unless this court is to depart from the long-standing rule that a landowner holds a fee title up to the center line

of an adjacent street, *Roeder Co. v. Burlington Northern, Inc.,* 105 Wn.2d 567, 575, 716 P.2d 855 (1986), *Burmeister,* at 211–12, these two positions cannot be reconciled.

The language and intent of the zoning code is clear: streets are not to be considered part of a landowner's lot area. Accordingly, we affirm the trial court and administrative determinations in denying Mall's application to build a 35–story building on a 4,170–square–foot lot.

■ Subsequent to the writing of this opinion, the parties have advised us that this case has settled. Because we have determined that this case involves matters of continuing and substantial public interest, particularly in the guidance it provides City officers in interpreting the Seattle Municipal Code, this opinion will be filed. *See In re Myers,* 105 Wn.2d 257, 261, 714 P.2d 303 (1986); *Sorenson v. Bellingham,* 80 Wn.2d 547, 558, 496 P.2d 512 (1972).

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, and DURHAM, JJ., concur.