**MUNICIPALITY OF ANCHORAGE, Appellant & Cross-Appellee,**

v.

**SISTERS OF PROVIDENCE IN WASHINGTON, INC., Appellee & Cross-Appellant.**

**Nos. 5017, 5018 and 5329.**

Supreme Court of Alaska.

May 8, 1981.

---

R. Michael Jackson and Ken Norman, Asst. Municipal Attys., Anchorage, for appellant.

Patrick B. Gilmore and Robert J. Dickson, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Chief Justice.

This appeal involves monies which were paid by the state to the Municipality of Anchorage pursuant to municipal revenue sharing statutes enacted in 1973. The funds in controversy were received by the Municipality under the provisions of former AS 43.18.010(h)(1)[1] and were generated by the Municipality's inclusion of the hospital operated by Sisters of Providence in Washington, Inc. ("Providence") in its annual revenue sharing applications for fiscal years 1974–76. During those years, the Municipality's position was that former AS 43.18.-050[2] gave it discretion to apportion funds received under former AS 43.18.010(h)(1) among health care facilities in Anchorage as it deemed appropriate. Providence, on the other hand, was of the view that AS 43.18.050 required that funds generated by its facilities be paid directly to it.[3]

There is a further dispute in regard to $92,071.77 that was paid over to Providence by the Municipality during this period. Of this total sum, $25,532 represents compensation for services rendered by Providence prior to fiscal year 1974. The remaining $66,539.77 was paid for various services provided by Providence during fiscal years 1974–76. Providence argued before the superior court that the $25,532 represented payment pursuant to contractual arrangements entered into and performed prior to the time the revenue sharing scheme became effective. As to the $66,539.77, Providence's position was that the Municipality was under a contractual obligation to pay that amount for services rendered during fiscal years 1974–76 that was entirely separate from its duty to pay over the revenue sharing funds. It is stipulated by the parties that $66,539.77 represents payment for specific services, which consisted of the establishment of a poison information center and the provision of social worker services. The Municipality's position was that the whole of the $92,071.77 was paid from revenue sharing funds and that it had the discretion not only to distribute those funds to various facilities as it saw fit but also to

---

1. Former AS 43.18.010(h)(1) reads:

    (h) During each fiscal year the state shall make payments as follows:
    (1) $1,000 per hospital bed to organized boroughs having health powers for each hospital bed actually used for patient care, limited to the number of beds provided for in the construction design of the hospital, or $50,000 per hospital for those hospitals with ten or more beds or $20,000 per hospital for those hospitals with less than ten beds as the local government may determine . . . .

    This section was repealed and re-enacted by ch. 265, § 2, SLA 1976. It was later repealed by ch. 155, § 11, SLA 1980 (effective July 1, 1980).

2. Former AS 43.18.050 reads:

    Specific Expenditures.
    A municipality shall expend funds received for the operation and maintenance of hospitals and health facilities and services under this chapter only for those specific facilities and services.

    This section was repealed by ch. 265, § 3, SLA 1976.

3. The former revenue sharing scheme for hospitals and health facilities was repealed by ch. 155, § 11, SLA 1980. Ch. 155, § 3, SLA 1980 (effective July 1, 1980) enacted a new scheme for state aid to health facilities and hospitals. See AS 29.89.030.

require that facilities receiving funds apply them to specific services.

Both parties agreed that the case involved no triable issues of fact and that, therefore, disposition by summary judgment would be appropriate. The superior court entered summary judgment awarding Providence $371,350.23, plus prejudgment interest. The court held that under former AS 43.18.050, Providence was entitled to all of the revenue sharing funds generated by the Municipality's inclusion of Providence's facility in the application for those funds but that that statute gave the Municipality the right to direct the specific uses to which those funds were to be put. The $371,-350.23 award was, therefore, determined by setting off the amount received by Providence for services rendered during fiscal years 1974–76 ($66,539.77) against the total amount received by the Municipality that was attributable to the inclusion of Providence in the revenue sharing application ($437,890). The court was of the view that the "wide discretion" the Municipality was entitled to exercise in restricting the use of revenue sharing funds did not justify application of the funds to payment of prior indebtedness. The $25,532 received by Providence for services rendered prior to fiscal year 1974 was, therefore, not included in the set-off allowed by the superior court.

The Municipality has appealed the superior court's interpretation of former AS 43.-18.050, its rejection of defenses of laches, waiver, and estoppel, and its award of attorney's fees to Providence. Providence, in its cross-appeal, argues that the superior court erred in finding that the legislature granted the Municipality discretion to restrict the use of these revenue sharing funds and, thus, that the $66,539.77 set-off was improper.

I.  Interpretation of Ch. 87 SLA 1973.

The original Alaska revenue sharing statutes, AS 43.18.010 et seq., were enacted in

1969 and did not include any provision for the funding of health care facilities. See ch. 95, § 10, SLA 1969. In 1970, AS 43.18.-010 was amended to provide for the application of revenue sharing funds toward operation and maintenance expenses of "health services or facilities." Ch. 194, § 3, SLA 1970. This amendment read, in pertinent part:

AS 43.18.010 is amended by adding new subsections to read:

(h) During each fiscal year the state shall pay to an organized borough or a city outside an organized borough, in which a health facility is operated, a sum equal to $1,000 for each bed actually used for patient care within the facility, limited to the maximum number of beds provided for in the construction design of the facility, or $4,000 for a facility, if the local government elects to accept payment on that basis for a particular facility. Sums received by a local government under this subsection shall be used for expenses of operation, maintenance or health services or facilities, as the local government determines.

(i) In (h) of this section 'health facility' or 'facility' includes hospitals, public health centers, community mental health centers, facilities for the mentally or physically handicapped, nursing homes and convalescent centers which are licensed by the state under AS 18.-20.130 and are owned or operated or both by a local government or by a nonprofit corporation or other nonprofit sponsor; the term excludes facilities operated or wholly supported by the state or the federal government.

In 1973, the above subsections were repealed and replaced by the revenue sharing scheme presently under consideration.[4] Ch.

---

4.  Ch. 87 SLA 1973 reads, in full:
   BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF ALASKA:
   * Section 1.  AS 43.18.010(h) and (i) are repealed and re-enacted to read:

(h) During each fiscal year the state shall make payments as follows:
(1) $1,000 per hospital bed to organized boroughs having health powers for each hospital bed actually used for patient care, limited to the number of beds provided for in the

87, §§ 1–3, SLA 1973. The re-enactment of AS 43.18.010(h), as it pertains to this dispute, reads as follows:

(h) During each fiscal year the state shall make payments as follows:

(1) $1,000 per hospital bed to organized boroughs having health powers for each hospital bed actually used for patient care, limited to the number of beds provided for in the construction design of the hospital, or $50,000 per hospital for those hospitals with ten or more beds or $20,000 per hospital for those hospitals with less than ten beds as the local government may determine . . . .

In addition, the legislature added the following section to the statutory scheme:

Sec. 43.18.050. *Specific Expenditures.* A municipality shall expend funds re-

construction design of the hospital, or $50,-000 per hospital for those hospitals with ten or more beds or $20,000 per hospital for those hospitals with less than ten beds as the local government may determine;

(2) $1,000 per hospital bed to each hospital located outside an organized borough having health powers for each hospital bed actually used for patient care, limited to the number of beds provided for in the construction design of the hospital, or $50,000 for those hospitals with ten or more beds or $20,000 per hospital for those hospitals with less than ten beds, as the hospital may determine;

(3) $1,000 per bed to an organized borough or city outside an organized borough in which a health facility is operated for each bed actually used for patient care, limited to the number of beds provided for in the construction design of the health facility, or $4,000 per health facility as the local government may determine;

(4) funds received by a local government under (1), (2) or (3) of this subsection shall be used for expenses of operation, maintenance, or health services or facilities, as the local government or hospital outside an organized municipality determines;

(5) before funds may be distributed under this subsection, the commissioner of health and social services shall certify to the distributing agency that any accumulation of assets by nonprofit corporations or other recipients under this subsection are dedicated irrevocably to a public purpose.

(i) In (h) and (j) of this section

(1) 'hospital' means a licensed hospital determined by the Department of Health and Social Services to be a general hospital; the term excludes facilities operated or wholly supported by the state or the federal government;

ceived for the operation and maintenance of hospitals and health facilities and services under this chapter only for those specific facilities and services.

The crucial alteration, as far as this appeal is concerned, was the removal of the last sentence of the 1970–73 version of AS 43.18.010(h) and its replacement by AS 43.-18.050. The change was from the provision for expenditure "as the local government determines" to the requirement that "funds received for the operation and maintenance of hospitals and health facilities and services" be expended "only for those specific facilities and services."

Finally, in 1976, in response to the dispute underlying this litigation, the legislature again amended the revenue sharing plan.[5]

(2) 'health facility' means public health centers, maternity homes and community mental health centers, facilities for the mentally or physically handicapped, nursing homes and convalescent centers which are licensed, when required, by the state under AS 18.20.010–18.20.130 and are owned or operated or both by a local government or by a nonprofit corporation or other nonprofit sponsor; the term excludes facilities operated or wholly supported by the state or the federal government.

* Sec. 2. AS 43.18 is amended by adding new sections to read:

Sec. 43.18.040. REGULATIONS. The Department of Community and Regional Affairs shall adopt regulations necessary to carry out the purposes of this chapter.

Sec. 43.18.050. SPECIFIC EXPENDITURES. A municipality shall expend funds received for the operation and maintenance of hospitals and health facilities and services under this chapter only for those specific facilities and services.

* Sec. 3. This Act takes effect July 1, 1973.

5. Ch. 265, § 3, SLA 1976 repealed AS 43.18.050, and ch. 265, §§ 2(1) and (2), SLA 1976 rewrote AS 43.18.010(h)(1) & (2) to read as follows:

(h) During each fiscal year the state shall make payments as follows:

(1) $2 per capita to a municipality which has the power to provide health facilities and services and in which a hospital is located;

(2) in addition to the payment made under (1) of this subsection

(A) the state shall make payments to a municipality which has the power to provide hospital facilities and services and which exercises the power on the basis of $1,000 per

This enactment made it clear that "payments to the municipality shall be transferred to the hospital in accord with the basis by which the entitlement was generated by the hospital." AS 43.18.010(h)(2)(B). Since July 1, 1976, when that provision took effect, the Municipality has transferred the appropriate revenue sharing funds directly to Providence.

"If the meaning of a statute is plain, it should be enforced as it reads without judicial modification or construction." *Horowitz v. Alaska Bar Association*, 609 P.2d 39, 41 (Alaska 1980).[6] Both parties cite this principle and, emphasizing different words within former AS 43.18.050, argue that the unambiguous language of that statute supports their respective positions.[7] Appellant's position is that the statute distinguishes the method by which eligibility for funds is determined (based upon "hospitals and health facilities and services") from the object of expenditure ("facilities and serv-

ices" only). The contention is that "[h]ad it been intended that hospitals must receive funds under these statutes, the word 'hospitals' would have been included along with 'facilities and services' in the expenditure clause of former AS 43.18.050." Appellant claims therefore, that the clear meaning of the statute limited its discretion as to expenditure of the revenue sharing funds only insofar as it required that funds generated by health care facilities be expended on health care facilities. Appellee's position, based upon the same legal principle, is that the plain meaning of the statutory language requires that municipalities "expend funds received for hospitals and health care facilities on the facilities which generated the funds." We believe that appellee's reading of former AS 43.18.050 is clearly the more reasonable one. But in view of the confusion that provision has generated, and the legislative history underlying it, we

---

bed for each bed actually used for patient care limited to the number of beds provided for in the construction design of the hospital, or $75,000 a hospital for those hospitals with 10 or more beds, or $25,000 a hospital for those hospitals with less than 10 beds, as the municipality may elect; funds received under this subparagraph may be used only for hospitals and shall be apportioned among qualifying hospitals as the municipality determines;

(B) the state shall make payments on the basis set out in (A) of this paragraph to a municipality for nonprofit hospitals not operated by a municipality if the municipality first certifies to the department that the hospital is in compliance with all standards for hospitals which have been adopted by the municipality; in the absence of this certification the funds which would have gone to the hospital lapse into the state general fund; payments to the municipality shall be transferred to the hospital in accord with the basis by which the entitlement was generated by the hospital and shall be applied to the annual cost of operation and maintenance of the hospital or for the provision of health care service at the hospital as the directors of the hospital determine;

(C) a hospital may not receive payment under both (A) and (B) of this paragraph.

6. We note that:

We have rejected that formulation of the plain meaning rule which mandates that we must disregard all legislative history if the statute's wording is clear and unambiguous

on its face. *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 n.7 (Alaska 1978). To do so would overly restrict our inquiry, since reference to legislative history may provide an insight which is helpful to making a judgment concerning what a statute means, *id.* at 540, and since words are necessarily inexact and ambiguity is a relative concept. *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.), *cert. denied*, 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973).

*State, Dep't of Natural Resources v. City of Haines*, 627 P.2d 1047, at 1049 n.6 (Alaska 1981). Even if the statute under consideration here were facially unambiguous, then, the plain meaning rule would not foreclose the possibility that consideration of legislative history would reveal an ambiguity not apparent on the face of the statute.

7. Appellant argues that:

The clear language of AS § 43.18.050 states that funds 'received for the operation and maintenance of *hospitals and health facilities and services* . . . are to be expended . . . only for those specific *facilities and services*.' [Appellant's emphasis]

Appellee, on the other hand, reads the statute as follows:

A municipality *shall* expend funds received for the operation and maintenance of hospitals and health facilities and services under this Chapter *only for those specific facilities and services*. [Appellee's emphasis]

think it inappropriate to base our holding solely on the plain meaning rule.

Both parties, likewise, rely on the sequence of legislative enactments discussed above in support of their arguments. It is agreed that prior to fiscal year 1974, Providence had no claim to revenue sharing funds distributed to the Municipality; it is also agreed that the 1976 enactment obliged the Municipality to pay over to Providence all funds of the kind in dispute here.

Two lines of authority indicate opposite interpretations of a sequence of legislative acts like this one. 2A C. Sands, *Sutherland Statutory Construction* § 49.11, at 265–67 (4th ed. 1973), and 1980 Supp. at 44–45. On the one hand, it has been held that "an amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act." *Atwood v. Regional School District No. 15*, 169 Conn. 613, 363 A.2d 1038, 1043 (1975), *quoting General Petroleum Corp. v. Smith*, 62 Ariz. 239, 157 P.2d 356, 360 (1945). The Arizona court went on to say that "[t]he rule seems to be well established that the interpretation of a statute by the legislative department goes far to remove the doubt as to the meaning of the law." *Id. See also Bowles v. Glick Bros. Lumber Co.*, 146 F.2d 566 (9th Cir. 1945). The California Supreme Court, on the other hand, seems to favor the opposite presumption. In *People v. Weitzel*, 201 Cal. 116, 255 P. 792, 793 (1927), that court held that, since the legislature cannot be presumed to have performed a useless act, an amendment must be presumed to change the pre-existing statute in all particulars in which the language of the act is materially changed. More recently, another court has said: "We believe that when the Legislature amended [the statute to be construed] to resolve the doubtful meaning of the provision, such action constituted evidence that the previous statute meant the exact contrary." *Roe v. Affleck*, 390 A.2d 361, 365 (R.I.1978) (citation omitted).

There is yet another body of modern authority that takes dispute or ambiguity surrounding a statute to be a strong indication

that subsequent amendment was intended to clarify, rather than change, existing law. 2A C. Sands, *Sutherland Statutory Construction* § 49.11, at 265–66 (4th ed. 1973). *See Bowen v. Statewide City Employees Retirement System*, 72 Wash.2d 397, 433 P.2d 150, 153–54 (1967). We think this approach is the preferable one in that it encourages realistic appraisal of the circumstances surrounding the amendment of a statute rather than mechanical adherence to one or the other of the above rules of statutory construction.

Here, it is clear that there was a good deal of dispute and confusion surrounding the interpretation of AS 43.18.050. Shortly after passage of that legislation, the Municipality apparently requested an interpretation of the statute from the Department of Community and Regional Affairs. The response to that request was contrary to the Municipality's interpretation. Mr. Don Argetsinger, Deputy Commissioner of that department, wrote, in a letter to the Municipality dated August 8, 1973, as follows:

[T]he Department understands this provision to mean municipalities receiving funds under the health facilities category of the State Revenue Sharing Program no longer have the latitude they previously had, in that [AS 43.18.050] specifically requires that funds received by virtue of the inclusion of a particular facility on the application must be expended for the operation and maintenance of that specific facility. This provision also requires these funds to be expended for those approved facilities in amounts equal to the municipality's entitlement for each facility.

Dissatisfied with that interpretation, the Municipality procured another opinion from the Department. In early 1975, Ms. McAnerny, who replaced Mr. Argetsinger, wrote that:

It is possible, albeit the record is not conclusive, that the Legislature intended to require expenditure for the operation and maintenance of specific facilities enumerated in the application and subsequently approved by the Department in

amounts equal to the entitlement computed with reference to each facility. Such was the thrust of Mr. Argetsinger's comments to Mr. Carman of your staff. Upon reflection, I suggest that a broader interpretation is possible. From the record of proceedings, it is possible to conclude also that the Legislature, in enacting AS 43.18.050, determined not so much . . . to remove from the municipality exercise of discretion as to use of the funds, but rather, consistent with the discretion affirmed in (h)(4), [acted] merely to restrict use of the funds received to the support of those programs or services implemented through those facilities or programs which have secured departmental approval, i. e., those which the Commissioner of Health and Social Services has certified pursuant to AS 43.18.010(h)(5) and other facilities or programs otherwise qualified under the definitional provisions of AS 43.18.010(i). In other words, the discretion or determination specifically granted to the municipality under subsection (h)(4) is not removed by section 050, but rather circumscribed to assure that no 'non-qualified' recipient, e. g., unlicensed facility where such license is required, facility for which the Commissioner cannot certify that assets are accumulated for a public purpose, or facility or service supported by the State or federal government, shall be allocated any portion of the shared-revenue entitlement by the municipality.

This confusion led to a recognition by the Division of Legislative Audit that the Municipality of Anchorage was the only local government in Alaska subscribing to the interpretation it advances in the present appeal. The Department of Community

and Regional Affairs responded by returning to its original interpretation, and ultimately the legislature amended the statutory scheme to conform unambiguously to that interpretation. We believe that this sequence of events exemplifies just the sort of ambiguity contemplated by the rule of statutory construction referred to in the *Bowen* case. The circumstances surrounding the legislature's amendment of this statutory scheme strongly indicate that the amendment was a clarification of, and not a change in, existing law.

Another canon of statutory construction relied upon by both parties is the presumption that "each section of a statute is presumed to serve some useful purpose." *Isakson v. Rickey*, 550 P.2d 359, 364 (Alaska 1976). Providence seeks to apply this presumption to the fact that the interpretation of former AS 43.18.050 urged by the Municipality would duplicate the provision of the previously enacted AS 43.18.010(h), ch. 194, § 3, SLA 1970, which reads, in pertinent part:

> Sums received by a local government under this subsection shall be used for expenses of operation, maintenance or health services or facilities, as the local government or hospital outside an organized municipality determines.

That provision was re-enacted as AS 43.18.-010(h)(4)[8] in 1973 when AS 43.18.050 was enacted. Ch. 87 SLA 1973. Since the Municipality's interpretation of former AS 43.-18.050 would render it redundant, Providence argues, that interpretation must be rejected because it fails to ascribe a "useful purpose" to the legislature's enactment of the statute.

The Municipality's argument under this canon is somewhat less persuasive. Accord-

**8.** AS 43.18.010(h)(4) read at that time:

> (h) During each fiscal year the state shall make payments as follows:
>
> . . . .
>
> (4) funds received by a local government under (1), (2) or (3) of this subsection shall be used for expenses of operation, maintenance, or health services or facilities, as the local government or hospital outside an organized municipality determines.

In 1976, the statute was again slightly altered, and read (until it was repealed by ch. 155, § 11, SLA 1980) as follows:

> (h) During each fiscal year the state shall make payments as follows:
>
> . . . .
>
> (4) funds received by a municipality under (1) or (3) of this subsection shall be used for expenses of health services or operation and maintenance of facilities as the municipality determines.

ing to the Municipality Providence's interpretation of former AS 43.18.050 requires that the funds in question be viewed as "a direct grant-in-aid to [the] hospital." If that interpretation is accepted, the argument goes, the legislative provision for the funds to be given first to the Municipality and then passed through to Providence was a useless act. Because such a useless act would violate the controlling presumption, the Municipality urges, the interpretation that gives rise to it must be rejected.

We note that the superior court's holding that the Municipality had the power to direct the uses to which the funds were to be put attributes a purpose to the legislative provision for passing the funds through municipal governments rather than making payment directly to the recipients. We therefore agree with Providence's claim that the presumption of a useful purpose behind each section of a statute supports its interpretation of the statute in question.

Finally, both parties argue that legislative history and purpose support their respective views. The Municipality's argument is that the superior court's interpretation of former AS 43.18.050 is in conflict with the legislature's express purpose in setting up the revenue sharing scheme, as stated in former AS 43.18.030(a), ch. 194, § 5, SLA 1973:

The intent of this chapter in authorizing state aid for municipal purposes is that local governments which levy property taxes reduce those levies in reasonable proportion to the amount of state aid received by a local government for a given fiscal year.[9]

The purpose of reducing local property taxes would have failed, according to the Municipality, to the extent that revenue sharing funds were given to privately operated facilities rather than to those operated by the Municipality. We note, again, that the superior court's interpretation defeats this argument by giving the Municipality discretion to direct specific uses of the funds, and thereby to provide services that would otherwise have to be provided at facilities operated by the Municipality.

Providence points to what it describes as a "scant but helpful" legislative history behind AS 43.18.050. Minutes from a meeting of the House Finance Committee on March 11, 1973, indicate that the statute was intended to ensure that aid to hospitals under the revenue sharing plan be given to hospitals rather than to other kinds of health care facilities.[10] And at the March 15, 1973, meeting of the same committee, it was explained that "[u]nder the bill the revenue would go directly to the hospital—not to

**9.** AS 43.18.030 was repealed by ch. 155, § 11, SLA 1980 (effective July 1, 1980).

**10.** The minutes from that meeting pertinent to H.B. 42 read:

Representative Freeman asked that the committee take up HOUSE BILL 42 ('An Act relating to revenue sharing with local governments for hospitals and health facilities; and providing for an effective date'). He stated that the Fiscal Note stated the cost of the program would be $700,000 or $500,000 under the committee substitute, but that what he proposed would cost only $131,000 and might require writing a new bill. He stated that he felt the aid to hospitals under the law was being provided in areas that really weren't hospitalization—detoxification areas, for example. Representative Freeman's suggestion was to come up with a definition of a hospital that would not permit this use of the funds. He said that the original bill dealt with hospitals with only 50 beds or less, and there are only 12 hospitals in that category in

the state; the total number of beds in these hospitals is 260.

Representative Freeman stated he was proposing that the following sliding scale be used in determining aid to these small hospitals:

Hospitals with 1 to 10 beds, $2,000 per bed

Hospitals with 10 to 20 beds, $1,750 per bed

Hospitals with 20 to 30 beds, $1,500 per bed

Hospitals with 30 to 40 beds, $1,250 per bed

Representative Freeman said this would cost $131,000 additional and would be a great assistance to the small hospitals. Representative Haugen, sponsor of the bill, stated that the committee substitute was not prepared properly and he felt that Representative Freeman's proposal was workable.

After further discussion, the bill was returned to the file. Representatives Freeman and Haugen stated they would work up a new committee substitute.

the boroughs." [11] These excerpts from the House Finance Committee's minutes provide additional support for the interpretation advocated by Providence and adopted by the superior court.

One final issue pertaining to the interpretation of former AS 43.18.050 must be addressed. The superior court's holding was based, at least in part, on its conviction that deference was owed to the decision of the Department of Community and Regional Affairs.[12] The Municipality asserts that the issue before the court was one of pure statutory construction, in which the Department of Community and Regional Affairs had no expertise, and that that issue should have been resolved independently of any agency opinion. Providence's position is that the superior court properly applied the "reasonable basis" standard of review, *Jager v. State*, 537 P.2d 1100, 1107 (Alaska 1975), in its consideration of the Department's interpretation. Alternatively, Providence argues that that interpretation is at least evidence of legislative intent and that even if no deference was owed it by the courts, it was properly considered by the superior court.

In view of the wording of the conflicting interpretations issued by the Department, and the content of former AS 43.18.050, we think that "the issue to be resolved turns on statutory interpretation rather than formulation of fundamental policy involving particularized expertise of administrative personnel" and that therefore the courts must "independently consider the meaning of the statute." *Hood v. State, Workmen's Compensation Board*, 574 P.2d 811, 813 (Alaska 1978). *See also State, Commercial Fisheries Entry Commission v. Templeton*, 598 P.2d 77, 81 (Alaska 1979); *Wien Air Alaska v. Arant*, 592 P.2d 352, 356 (Alaska 1979). Because the Department's interpretation was not a matter "involving particularized expertise of administrative personnel," the superior court was in error in giving it deference. It should have made an independent judgment as to the appropriate construction of the statute. On appeal, this court must make that same independent judgment. *State Commercial Fisheries Entry Commission v. Templeton*, 598 P.2d 77, 81 (Alaska 1979). That does not, however, mean that neither the superior court nor this court can give due consideration to the Department's interpretation, for in *Union Oil Co. of California v. Department of Revenue*, 560 P.2d 21, 25 (Alaska 1977), we held that, in interpreting an ambiguous statute, "we may . . . give some weight to the administrative decision even when exercising our independent review."

11. The minutes pertinent to C.S.H.B. 42 read: The committee then considered COMMITTEE SUBSTITUTE FOR HOUSE BILL NO. 42 (Finance) (an Act relating to revenue sharing with local governments for hospitals and health facilities; and providing for an effective date). The committee had requested that a committee substitute be prepared and Mr. Warwick explained this bill. He said this does not increase the amount of money going to the detoxification centers. Under the bill the revenue would go directly to the hospital—not to the boroughs. Discussion followed. Mr. Warwick moved and asked unanimous consent that CSHB 42 (Finance) pass from committee with a 'do pass' recommendation. Mr. Hillstrand objected. The bill passed from committee with 6 'do pass' and 1 'do not pass' recommendation.

12. The court stated:
   It is the duty of the courts of this state to give deference to an administrative agency's determination of a statute, when such a decision involves administrative expertise as to either complex subject matter or fundamental policy considerations and when it has a reasonable basis in law and fact, *Weaver Brothers, Inc. v. Alaska Transportation Commission*, [588 P.2d 819 (Alaska 1978)], and cases cited therein at n.6.
   The Department of Community and Regional Affairs has come forth with several statements regarding their interpretation of the statute in question. Here AS 43.18.050 involves distribution of revenue sharing funds to local municipalities for specified purposes, a complex matter on which the Department has developed an expertise over the course of years. The final interpretation by the Department has determined that § 050 requires distribution of the funds to the specific hospitals involved . . . certainly a reasonable interpretation in light of the well-reasoned arguments for both it and its contrary interpretation. It is thus the ruling of this court that the Department's final determination will be given deference . . . . [footnote omitted]

Since we are persuaded that the principles of statutory construction previously considered demonstrate that the superior court's interpretation of the statute was correct, we conclude that the superior court's apparent deference to the Department's opinion does not vitiate the overall correctness of its interpretation of the statute. We therefore hold that former AS 43.18.050 obligated the Municipality to pay over to Providence all funds generated by the inclusion of Providence in the Municipality's application for revenue sharing funds.

II. Validity of set-offs allowed by the superior court.

Former AS 43.18.010(h)(4) [13] reads, with emphasis added by the superior court:

[F]unds received by a local government under (1) . . . of this subsection shall be used for expenses of operation, maintenance, or health services or facilities, *as the local government . . . determines.*

In its first judgment in this case, entered on January 31, 1979, the superior court held that the statute "allowed the Municipality to place whatever restrictions . . . it wished" on the use of the revenue sharing funds it was obliged to pay to Providence. Ultimately, that holding was modified by the court's recognition that although "the Municipality had wide discretion to restrict the expenditure of these funds, . . . that discretion was not unbounded." The fact that the statutory language restricted expenditure to "operation or maintenance," according to the superior court, precluded the Municipality's use of the funds to satisfy debts that existed prior to the statute's effective date. The court therefore allowed the Municipality a set-off against the total award for the amount that was paid to Providence for services rendered during fiscal years 1974–76 ($66,539.77), but disallowed the claim for an additional set-off of a payment for services rendered prior to the effective date of the revenue sharing plan ($25,532).

In its cross-appeal, Providence argues that the superior court's reading of former AS 43.18.010(h)(4) was erroneous and that no set-off should have been allowed. Cross-appellant's position is that in contracting with it for a poison information center and disaster beds, and the services of a medical social worker, the Municipality incurred an obligation entirely separate from that imposed by former AS 43.18.050. The argument is that the statute evidences a legislative purpose to support health care facilities, and that that purpose would be defeated if municipalities could condition payment of revenue sharing funds on performance of additional services.

We find this argument unpersuasive for a number of reasons. First, and most important, is the apparent conflict with the legislature's stated purpose in enacting the revenue sharing plan: to reduce local property taxes. Former AS 43.18.030(a). As the Municipality points out, a direct grant-in-aid to Providence would not reduce taxes in the same straightforward way as would allowing the funding to be conditioned on performance of specific services that would otherwise have to be performed at municipal facilities. Second, we agree with the Municipality's argument that Providence's interpretation imputes a useless act to the legislature. If the Municipality had no discretion to determine how these funds were used, then there was no point in the intermediate location of the funds at the municipal level. Had the legislature not intended that municipalities exercise some discretion, in other words, it would have paid the funds directly to the hospitals. Third, there is every indication that Providence received payment for the services it provided during fiscal years 1974–76 with the understanding that the source of payment was revenue sharing funds. Providence requested payment for those services by filing a series of forms under the title, "Request for Revenue Sharing Funds." The arrangement between the parties was apparently initiated by a "formal request for participation in the . . . Revenue Sharing program" con-

13. *See* note 8 *supra.*

tained in a letter written by the Controller of Providence Hospital. Further, it is clear that the Municipality considered that payment was to be made to Providence out of revenue sharing funds. For these reasons, we believe that Providence is now precluded from claiming that the contracts in force between fiscal years 1974 and 1976 constituted obligations that were separate from the revenue sharing plan. All of the general elements required for the application of the equitable estoppel doctrine—"assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice," *Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 102 (Alaska 1978) —are present in this case.

In response to this cross-appeal, the Municipality invokes arguments made in its opening brief concerning the proper interpretation of former AS 43.18.010(h)(4). Essentially, those arguments depend upon the "plain meaning rule," discussed above, and the legislative purpose behind the whole revenue sharing scheme.

■ Although we are not persuaded that this statute is sufficiently straightforward to be interpreted under the "plain meaning rule," *see Horowitz v. Alaska Bar Association*, 609 P.2d 39, 41 (Alaska 1980), we agree with the superior court in reading former AS 43.18.010(h)(4) to allow the Municipality discretion to restrict the uses to which these funds were put. We also agree that use of the funds to satisfy debts incurred prior to the effective date of the revenue sharing plan under consideration was not within that discretion, since such payments cannot be regarded as restrictions placed on Providence's use of the funds which the Municipality was obligated to pay over. The superior court's construction of the statute is in conformity with both the legislative intent underlying it, *see* former AS 43.18.030(a), and the presumption against useless legislative acts, *see Isakson v. Rickey*, 550 P.2d 359, 364 (Alaska 1976). We therefore affirm the superior court's set-off of funds paid to Providence for services rendered during fiscal years 1974–76 as well as its refusal to allow a set-off for funds used by the Municipality to satisfy prior indebtedness.

### III. Affirmative defenses.

The Municipality argues that the superior court erroneously rejected its defenses of waiver, estoppel, and laches. As to the first two, the superior court found that "the Municipality has brought forth no evidence whatever that would substantiate either of these assertions." Likewise, the court found "no basis" for the defense of laches. We find it difficult to fault those determinations.

■ Both parties define waiver to mean "the intentional relinquishment of a known right." *See Arctic Contractors, Inc. v. State*, 564 P.2d 30, 40 (Alaska 1977). The record makes clear that Providence has continuously demanded the revenue sharing funds in issue here virtually from the time that former AS 43.18.050 became effective. Litigation was seriously contemplated by September 1974, and a proposed complaint and memorandum of law were forwarded to the Municipality on December 16, 1974, in the hope of avoiding litigation. Our review of the record leads us to the same conclusion as was reached by the superior court: there is no evidence whatever that Providence "intentionally relinquished" its claim at any point.

■ Both parties likewise rely upon the same definition of estoppel: "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *See Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 102 (Alaska 1978). The Municipality's position seems to be that Providence, in failing to seek an injunction to prevent expenditure of its claimed share of the revenue sharing funds, somehow adopted a position inconsistent with the one it now asserts. We fail to see any merit in that argument, especially in view of the fact that Providence made its claim to the fund known almost from the time the statute upon which the claim was based became effective.

The Municipality's laches defense suffers from an additional defect beyond the problems encountered by the two affirmative defenses considered above. There is substantial authority in support of Providence's assertion that a suit for money had and received, the theory on which the superior court court based its award, is a legal, not an equitable, action. *See, e. g., Ryan v. Spaniol*, 193 F.2d 551, 553 (10th Cir. 1951); *Jenkins v. Kaplan*, 50 N.J.Super. 274, 141 A.2d 802, 807 (App.Div.1958); *Haggerty v. Nobles*, 244 Or. 428, 419 P.2d 9, 15 (1966) (en banc). Since laches is a defense only in equitable actions, Providence argues, it is simply inapplicable to this lawsuit. *See Rinke v. Schuman*, 246 Ark. 976, 440 S.W.2d 765, 768 (1969); *First Citizens' National Bank v. MacAllister*, 117 N.H. 277, 371 A.2d 1175, 1176 (1977); *Moore v. American Finance System*, 236 Ga. 610, 225 S.E.2d 17, 19 (1976). But because it is not entirely clear that an action for money had and received is not cognizable in equity, *see, e. g., Wilson Cypress Co. v. Atlantic Coast Line Railroad Co.*, 109 F.2d 623, 627 (5th Cir. 1940), or that the law-equity distinction is still crucial to a determination of the applicability of laches, *see Moore v. State*, 553 P.2d 8 (Alaska 1976), we review the merits of the defense.

■■■ The defense of laches requires a showing of "inexcusable delay, resulting in undue prejudice to the defendant." *Moore v. State*, 553 P.2d 8, 15 (Alaska 1976). Concerning the delay element, the record indicates that the Municipality's claim that "Appellee let nearly three years elapse without doing a thing" is simply false. As pointed out above, Providence made its claim to revenue sharing funds known to the Municipality shortly after AS 43.18.050 came into existence. As to prejudice, the Municipality's argument is that, having paid the disputed funds to other health facilities, it cannot retrieve them and will

be prejudiced by having to pay a judgment out of a revenue source other than the state revenue sharing plan. It is difficult to understand, as Providence points out, how the prejudice suffered by the Municipality differs from that suffered by any party that loses a lawsuit. Appellant's laches argument fails on the merits, and must be rejected even if the defense is applicable to this action.

### IV. Monetary relief.

■■■ The Municipality raises in this appeal, for the first time, the argument that Providence is not entitled to monetary relief because it suffered no financial loss. Because this court has "consistently held that an issue which was not raised in the trial court will not be treated on appeal," *University of Alaska v. Simpson Building Supply Co.*, 530 P.2d 1317, 1324 (Alaska 1975), we need not consider the merits of this contention in detail.[14] We note, however, that an action for money had and received may be maintained whenever one has money in his hands belonging to another which, in "equity and good conscience," should be paid over, *Atlantic Coast Line Railroad Co. v. Florida*, 295 U.S. 301, 309, 55 S.Ct. 713, 716, 79 L.Ed. 1451, 1457 (1935), and that such actions have been successfully brought for recovery of public monies paid in violation of the law, *State v. Maryman*, 181 Ark. 91, 24 S.W.2d 952 (1930); *In re Community Co-op. Industries*, 279 Mich. 610, 273 N.W. 287 (1937). The Municipality offers no convincing authority in support of its assertions to the contrary. We therefore reject the contention that monetary relief is inappropriate in this case.

■■■ Finally, appellant urges that since this action is based upon a statute, the two year statute of limitations, AS 09.10.-070,[15] precludes recovery. This is an af-

---

14. This court will notice a claim not raised in the trial court if necessary "to prevent a miscarriage of justice." *Wright v. Vickaryous*, 598 P.2d 490, 499 (Alaska 1979).

15. AS 09.10.070 reads:

*Actions to be brought in two years.* No person may bring an action (1) for libel, slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of another not arising on contract and not specifically provided otherwise; (2) upon a statute for a forfeiture or penalty to the

firmative defense which was not pled and was therefore waived. *Barrett v. Byrnes,* 556 P.2d 1254, 1255 (Alaska 1977). Beyond that, an action for money had and received sounds in contract, *Puget Sound Alumni of Kappa Sigma, Inc. v. City of Seattle,* 70 Wash.2d 222, 422 P.2d 799, 804 (1967) (en banc), and is therefore subject to a six year limitation period.[16] *See Estate of Waters v. Hoadley,* 474 P.2d 85, 86–87 (Alaska 1970).

## V. Attorney's fees.

Consolidated Case No. 5329 is an appeal of the superior court's award of $37,936.48 in attorney's fees, pursuant to the fee schedule contained in Alaska R.Civ.P. 82(a)(1),[17] to Providence as prevailing party. The Municipality's sole claim on this appeal is that the court's reliance on the section of that rule appropriate to actions resolved without trial constituted an abuse of discretion. This argument is anomalous in that the rule's language requires adherence to the schedule "[u]nless the court, in its discretion, otherwise directs." Alaska R.Civ.P. 82(a)(1).

▉▉▉ The matter of awarding fees, as is indicated by the rule, is committed to the discretion of the trial court. *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970). An abuse of discretion, in this context, "is established where the trial court's determination as to attorney's fees was manifestly unreasonable." *Id.* Although it has been held to be "manifestly unreasonable" for a trial court to "automatically" award the full amount of attorney's fees incurred, *Malvo v. J. C. Penney Company, Inc.,* 512 P.2d 575, 587 (Alaska 1973), none of our previous decisions have held that adherence to the rule's schedule is "manifestly unreasonable" and appellant cites none. Appellant seems, indeed, to urge that this court repudiate Civil Rule 82(a)(1) on policy grounds. We are not persuaded that such an action is warranted.

In conclusion, we are in agreement with the superior court's interpretation of ch. 87 SLA 1973 even though it appears that the superior court relied somewhat excessively upon an administrative agency's opinion in arriving at its interpretation of former AS 43.18.050. That court correctly rejected various affirmative defenses argued before it and awarded monetary relief and attor-

---

state; or (3) upon a liability created by statute, other than a penalty or forfeiture; unless commenced within two years.

**16.** AS 09.10.050 reads:
*Actions to be brought in six years.* No person may bring an action (1) upon a contract or liability, express or implied, excepting those mentioned in §§ 40 or 55 of this chapter; (2) for waste or trespass upon real property; or (3) for taking, detaining, or injuring personal property, including an action for its specific recovery, except those mentioned in

§ 55 of this chapter; unless commenced within six years.

**17.** Alaska R.Civ.P. 82(a) reads:
*Attorney's Fees.*
(a) *Allowance to Prevailing Party as Costs.*
(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

| | | Contested | Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 15% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.
(2) In actions where the money judgment is not an accurate criteri[on] for determining the fee to be allowed to the prevailing side,

the court shall award a fee commensurate with the amount and value of legal services rendered.
(3) The allowance of attorney's fees by the court in conformance with the foregoing schedule is not to be construed as fixing the fees between attorney and client.

ney's fees in the proper amounts to appellee Providence.

The superior court's judgment is therefore AFFIRMED.